**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1571**

GARTEN TRUCKING LC,

        Petitioner,

and

ASSOCIATION OF WESTERN PULP AND PAPER WORKERS,

        Intervenor,

v.

NATIONAL LABOR RELATIONS BOARD,

        Respondent.

**No. 24-1614**

NATIONAL LABOR RELATIONS BOARD,

        Petitioner,

ASSOCIATION OF WESTERN PULP AND PAPER WORKERS,

        Intervenor,

v.

GARTEN TRUCKING LC,

        Respondent.

On Petition for Review of an Order of the National Labor Relations Board. (10−CA−304929)

Argued:  March 20, 2025                                    Decided:  June 2, 2025

Before WILKINSON, GREGORY, and QUATTLEBAUM, Circuit Judges.

Petition denied, and cross-petition for enforcement granted, by published opinion. Judge Wilkinson wrote the opinion in which Judge Gregory and Judge Quattlebaum joined.

**ARGUED:** King Fitchett Tower, WOODS ROGERS VANDEVENTER BLACK PLC, Roanoke, Virginia, for Petitioner/Cross-Respondent.  Gregory P. Lauro, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:**  Agnis C. Chakravorty, WOODS ROGERS VANDEVENTER BLACK PLC, Roanoke, Virginia, for Petitioner/Cross-Respondent.  Jennifer A. Abruzzo, General Counsel, Jessica Rutter, Deputy General Counsel, Peter Sung Ohr, Associate General Counsel, Ruth E. Burdick, Deputy Associate General Counsel, Kira Dellinger Vol, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  David A. Rosenfeld, WEINBERG, ROGER & ROSENFELD, Emeryville, California, for Intervenor.

2

WILKINSON, Circuit Judge:

The petitioner challenges a decision made by the National Labor Relations Board ("NLRB" or "Board") that his rough response to a union flyer constituted an unfair labor practice. The NLRB found that because the petitioner's message purported to tie wage increases to employees' union activities, it was a coercive threat of reprisal. As such, the speech violated the National Labor Relations Act ("NLRA") and was not protected under either the Act or the First Amendment. Because we find that the NLRB had substantial evidence to reach this conclusion with respect to one sentence of the petitioner's post which recast his communication in a coercive light, we now uphold the Board's decision. In doing so, however, we distinguish between this one coercive sentence and the remainder of the petitioner's message. Indeed, we emphasize that employers are constitutionally and statutorily entitled to give their noncoercive opinion on union activities, especially in the midst of organizing campaigns, and that such unfettered exchange advances the democratic values of our nation's labor systems.

I.

A.

Petitioner Robert "Dizzy" Garten ("Garten") owns and operates Garten Trucking LC ("Garten Trucking"), a company in Covington, Virginia specializing in the transportation of paper products and other such goods. In early June 2021, two Garten Trucking employees coordinated with Intervenor Association of Western Pulp and Paper Workers ("Union" or "AWPPW") to begin an organizing campaign to unionize

3

approximately 109 workers at Garten Trucking's facilities. A union representation election was held between August 4-6, 2021, and AWPPW lost the election by a vote of 65-30. *See* J.A. 107; *Garten Trucking, LLC*, Nos. 10-CA-279843 et al., 2023 WL 2070300, slip op. at 1 (N.L.R.B. Div. of Judges). However, rather than spelling the end of the Union's efforts, the election loss led to a series of bitter and lengthy disputes over Garten Trucking's labor practices. This case thus comes before us amidst a continued organizing push, with both sides deeply entrenched in their positions and desirous of securing the favor of employees.

Indeed, after its election loss, AWPPW filed a bevy of unfair labor practice charges, contending that these violations fatally tainted the election results. The charges were consolidated and heard before an Administrative Law Judge ("ALJ"). On February 17, 2023, the ALJ issued its findings of fact and conclusions of law, determining that Garten Trucking had engaged in various behaviors violative of Section 8(a)(1) of the NLRA, including (1) unlawfully interrogating employees, (2) creating an impression that "union activities were under surveillance," (3) making various "threat[s] to close its business and threatening employees with job loss if they chose the Union as their bargaining representative, as well as informing employees it would be futile for them to select the Union as their bargaining representative," and (4) "telling employees that it disciplined them for their union activity." *Garten Trucking*, 2023 WL 2070300, slip op. at 44-45. The ALJ ordered that the election results be set aside and that a new election be held. *Id.* slip op. at 2. Garten Trucking subsequently filed exceptions with the NLRB. While none of *these* actions are at issue here, they provide relevant context for deciphering the effect of the communications we now review.

4

On September 17, 2023, the NLRB affirmed the ALJ's findings of facts and conclusions of law but amended the remedy to order mandatory bargaining with AWPPW because a "majority of [Garten Trucking's] employees supported the Union before [the company] engaged in unfair labor practices." *Garten Trucking LC*, 373 N.L.R.B. No. 94, 2024 WL 4229704, at *3-4 & n.4.

### B.

While the Union's initial case was pending before the ALJ and NLRB, it continued its organizing efforts. These activities included the dissemination of a flyer on September 19, 2022, asserting that Garten Trucking was required to bargain with the AWPPW and that the Union's "presence creates raises for [the company's] employees":

> Have you received a pay increase? If so, how much of a pay increase have you received since the AWPPW has helped you start a union campaign?
>
> Garten Trucking is currently picking and choosing who they are giving pay increases to.
>
> It is illegal for Garten Trucking to give raises without bargaining with the AWPPW and the AWPPW will not bargain without your input and your voice.
>
> As a member of the AWPPW, everybody gets raises! We want raises for every employee, not just a select few.
>
> When the AWPPW begins bargaining percentage raises for everybody, your wages will be larger because the union was here fighting for you.
>
> The court case has now been completed. All sides now have (35) days to get their legal briefs to the presiding judge. After this period, the judge will then deliberate and make a final decision.

J.A. 94 (emphasis omitted).

5

Later in the evening on September 29, 2022, Garten posted a response to the flier on the company's internal message board available to all employees. Garten's message contested that the Union was responsible for any pecuniary benefit Garten's employees had previously received. In its entirety, the post read:

> I have been honest with everyone since day 1 and have done everything I can do to try and help all the employees in every area of GT, GT2, Big Island, and the warehouses, and I want you to be the first to know that everything that is in that letter that those worthless pieces of trash put in that paper they handed out is pure horseshit. For them to say they have anything to do with a raise for you all is nothing but a lie. They don't even get to talk to anyone at the mill. I can't speak for everyone, but I can say with 100% confidence that I would never let 2 idiots like [Union organizers] Jeff Baker and Miles whatever his name is be in charge of your families [sic] income. I would resign first. As a matter of fact if it wasn't for them trying to steal money out of your paychecks you would already have your raises.

J.A. 96. Five employees reacted to the message with a thumbs-up emoji, and two employees replied with positive comments. J.A. 98-100.

On October 11, 2022, the Union filed an unfair labor practice charge with the NLRB, claiming that Garten's post constituted a new unfair labor practice under Section 8(a)(1). J.A. 90. The NLRB's general counsel subsequently issued a complaint, and a hearing was held before an ALJ on October 17, 2023. J.A. 5, 78. On December 7, 2023, the ALJ ruled against Garten Trucking, concluding that Garten violated Section 8(a)(1) by suggesting that employees "would have already received a raise if it were not for their union activities." J.A. 111.

Garten Trucking objected to the ALJ's decision and sought review by the NLRB. J.A. 119-20. On May 24, 2024, the NLRB issued a decision adopting the ALJ's conclusions. J.A. 151. Garten Trucking subsequently petitioned this court for review.

6

II.

This court reviews the NLRB's factual findings and application of undisputed law to facts under a substantial-evidence standard. *See Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 230 (4th Cir. 2015). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 313 (4th Cir. 2021) (quoting *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 210 (4th Cir. 2005)). We note, however, that the *interpretation* of a statute like the NLRA is "exclusively a judicial function," and afford the NLRB's interpretation deference only to the extent that the agency's opinion has the "power to persuade." *Loper Bright*, 603 U.S. at 387-88, 393 n.4 (first quoting *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 544 (1940); then quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 528 (6th Cir. 2024).

This case implicates the relationship between two subsections of the NLRA: Sections 8(a)(1) and Section 8(c). Section 8(a)(1) broadly prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in [Section 7 of the NLRA]." 29 U.S.C. § 158(a)(1); *see id.* § 157 (providing various rights to self-organization, collective bargaining, and other union activities). "It is axiomatic that the rights enshrined in the [NLRA] do not evaporate after [a union] election." *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir. 1988). Section 8(c) clarifies, however, that

> [t]he expressing of any views, argument, or opinion, or the dissemination
> thereof, whether in written, printed, graphic, or visual form, shall not
> constitute or be evidence of an unfair labor practice under any of the

7

provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

We do not deal here exclusively with the statutory guardrails of employer speech. Indeed, the union-election context of this case implicates broader First Amendment principles protective of campaign speech. It is true that labor elections and the elections of public officials do not map onto one another perfectly. *See NLRB v. Gissell Packing Co.*, 395 U.S. 575, 617-18 (1969). Union elections take place in closed environments where one party has significant economic control over the electorate. They are governed by separate rules and regulations, chief among them the NLRA. However, union elections and public-official elections both enable democratic governance. Whether an election be for union representation, school board officials, state representatives, or U.S. Senators, voters are selecting a proxy to advocate on their behalf. The First Amendment principles special to elections thus serve as an informative guidepost for our interpretation of Section 8(c) despite the idiosyncrasies of union elections. We therefore begin with a brief overview of those principles.

### A.

The First Amendment exists in large part to protect political speech and preserve the sanctity of public discourse. Indeed, the Amendment emerged out of an environment where independence was won and the Constitution crafted through vigorous campaigning. It was an era of pamphleteering, sermons, and speeches, where many men could pick up a pen and join the discordant choir of Revolutionary politics. *See* BERNARD BAILYN,

8

IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 5 (1967) ("Any number of people could join in such proliferating polemics, and rebuttals could come from all sides.").

The First Amendment preserves this ethos, especially in times of election. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Laws and policies must be forged in the fires of widespread public debate, their value tested by rounds of criticism and refutation. To be anything but illusory, public discourse must embrace a robust free market of ideas. *See* ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT 22-23 (1948). The electorate relies on this "unfettered interchange of ideas" in order to make informed decisions regarding "political and social changes." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). And because these choices can have such strong impacts on the electorate, the First Amendment's protection of free speech "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). We thus always "err on the side of protecting political speech rather than suppressing it." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007).

In the context of campaigns, our reading of the First Amendment is capacious; we are generally skeptical of a "'highly paternalistic approach' limiting what people may hear." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976)). And this skepticism has only grown in light of the Supreme Court's repeated repudiation of laws limiting campaign speech or donations by specific actors. *See, e.g., Citizens United*

*v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *McCutcheon*, 572 U.S. at 191. "The First Amendment . . . 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Learned Hand, J.)).

Throughout our history, courts have reiterated that neither Congress nor the states may elevate the voice of some speakers over others. *See Ariz. Free Enter. Club v. Bennett*, 564 U.S. 721, 741 (2011); *McCutcheon*, 572 U.S. at 191. The Supreme Court in *Citizens United* raised the concern that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." 558 U.S. at 340. And in campaign environments where two parties predominate, restricting one side's ability to openly communicate inhibits that side from "establish[ing] worth, standing, and respect for [its] voice." *Id.* at 340-41. Thus, identifying "preferred speakers" may not only foster viewpoint discrimination, but also "reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 340 (quoting *Buckley*, 424 U.S. at 19).

The above discussion is necessarily abbreviated; it cannot capture the nuance of centuries of First Amendment campaign-speech doctrine. Suffice it to say that the breadth of First Amendment protections of campaign speech does not, of course, preclude all attempts at regulation. Indeed, to preserve the informative value of political debate, the government has often instituted valid anticorruption measures on top of traditional libel laws. *See* MEIKLEJOHN, *supra*, at 22 (discussing how political debate sometimes requires

10

a metaphorical "chairman or moderator"). The paradigmatic campaign-speech regulations held to be constitutional are those targeting "*quid pro quo* corruption." *McCutcheon*, 572 U.S. at 192, 209 (citing *Wis. Right to Life*, 551 U.S. at 457). In these scenarios, the speaker is not using speech to persuade action, but rather as a means of compelling action from a voter or candidate through reward, coercion, blackmail, bribery, or other corrupt methods. The sanctity of free choice is tainted by coercive speech, such that the electorate is not making a decision based on a candidate or policy's inherent virtues.

In these narrow cases, government intervention may be appropriate. However, such interference should be reserved for extraordinary occasions. There is often a fine line between a *quid pro quo* and a common campaign promise, but "the distinction must be respected in order to safeguard basic First Amendment rights." *McCutcheon*, 572 U.S. at 209. A claim that a law is "enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Eu*, 489 U.S. at 228 (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 221 (1986)). And "no test of reasonableness" will save a law that effectively "urge[s] people to vote one way or another in a publicly held election." *Mills v. Alabama*, 384 U.S. 214, 220 (1966).

## B.

The NLRA embodies and "implements" these First Amendment principles. *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (quoting *Gissel*, 395 U.S. at 617). Congress was clear that Section 8(c) sought to expand the range of permissible employer speech during union campaigns, and that the provision should not be read

11

narrowly. Prior to the addition of Section 8(c) in 1947, the NLRB mandated "complete employer neutrality" during labor organizing efforts, and it largely ignored Supreme Court dictates to respect employers' speech. *Id.* at 66-67; H. REP. NO. 245, at 8 (1947) ("Although the old Labor Board protests it does not limit free speech, it is apparent from decisions of the Board itself that what persons say in the exercise of their right of free speech has been used against them.").

As part of the Taft-Hartley Act, Congress sought to restore balance between employees and employers, guaranteeing to both "the full exercise of the right of free speech." H. REP. NO. 245, at 6; 93 CONG. REC. 3424 (Apr. 15, 1947) (statement of Rep. Hartley). And, indeed, the Act's sponsors were clear that the final language adopted was arguably the strongest option for employer speech proposed. *See* 93 CONG REC. 6445 (June 5, 1947) (statement of Senator Taft); *id.* at 6443-44.

In passing the Taft-Hartley Act, Congress relied upon the same concerns for public discourse and an informed voting base that our Founders and the Court invoked in protecting campaign speech generally. *See Linn v. United Plant Guard Workers of Am.*, 383 U.S. 53, 62 (1966) (discussing how the Taft-Hartley Act was based upon a "congressional intent to encourage free debate on issues dividing labor and management"). Open dialogue between employers, employees, and unions "nurtures a healthy and stable bargaining process." *Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 875 (4th Cir. 1999); *accord. Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 (1974) ("[F]ederal policies favor[] uninhibited, robust, and wide-open debate in labor disputes . . . .").

12

As with campaign speech, Congress distinguished between purely persuasive speech and speech designed to effectuate an explicit or implicit threat or agreement for a course of action—a *quid pro quo*. *See Americare*, 164 F.3d at 875. Section 8(c) makes only the latter impermissible. Employers' speech cannot exact penalty or tender reward for union activity or lack thereof. But employers are given the opportunity to *persuade* employees of the merits of forswearing unionization without resort to strongarmed measures. Indeed, "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982) (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)).

## III.

In order to uphold the NLRB's determination, we must find that some part of Garten's message interfered with employees' exercise of their labor rights in violation of Section 8(a)(1). In turn, under Section 8(c), any part of the message is only admissible as evidence of an unfair labor practice if it constitutes a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). These two sections point effectively toward the same question: was the message objectively coercive?

Garten posted a long response to the Union's flyer. Much of Garten's response was coarse; little of it was decorous. But its brusque and combative tone was still within the bounds of acceptability. For us to conclude otherwise would ignore Section 8(c) and make speech during a union organizing campaign a one-sided affair.

There is a fundamental difference between speech imposing an improper *quid pro quo* and speech which merely attempts to persuade on the merits, leaving employees free to vote without penalty or reward dangling over their heads. The very nature of democratic governance in labor systems requires that "[e]mployers [] be free to communicate their positions." *Americare*, 164 F.3d at 876. Garten is entitled to share his concerns regarding the costs of unionization. This is a form of "legitimate propaganda." *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 516 (4th Cir. 1998) (quoting *Be-Lo Stores v. NLRB*, 126 F.3d 268, 286 (4th Cir. 1997)). He is also permitted to respond to the criticism that the Union levied against him. Campaign environments require the ability of parties to "adequate[ly] reply to these charges"—otherwise the First Amendment is "wholly ineffective in protecting the electorate from confusive last-minute charges and countercharges." *Mills*, 384 U.S. at 220 (internal quotation marks omitted).

The majority of Garten's message served lawful purposes; he rebutted the facts of AWPPW involvement in determining raises and evinced his belief that employees are better off without the Union. This is a valid position to take, one which employees are entitled to hear, and one which gives them worthwhile and useful information on which to base their votes. Only in including the final sentence did Garten venture into impermissible territory harmful to free debate.

The caustic nature of Garten's speech thus does nothing to change our analysis. Campaigns often resemble a barroom brawl more than they do a poised, prim-and-proper duel. Since the very beginning of our nation, candidates and their supporters have not shied from visceral exhortations. *See, e.g.*, Rev. Timothy Dwight, President of Yale Univ., The

14

Duty of Americans, at the Present Crisis, (July 4, 1798) (suggesting that support for Jeffersonian Republicans would "change our holy worship into a dance of Jacobin phrenzy, and . . . [place] a strumpet personating a goddess on the altars of Jehovah . . . that we may see our wives and daughters the victims of legal prostitution; soberly dishonoured; speciously polluted; the outcasts of delicacy and virtue, and the lothing of God and man").

The most spirited of modern charges thus have unrestrained ancestral roots. And "[f]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940). To silence one party is to steal from voters the liberty of actual choice. Perhaps unionization is the right decision, perhaps not. That is a question not for the courts, but for employees, and employees require access to a full range of information and positions, from union advocates to be sure, but also from their employers.

## IV.

The last sentence of Garten's post, however, tells a different story: "As a matter of fact if it wasn't for [AWPPW] trying to steal money out of your paychecks you would already have your raises." J.A. 96. This statement could be interpreted in one of two ways: (1) as a general matter, employees would fare better if they were not unionized, and (2) as a real threat not to grant future wages if there was a union presence. If the sentence fell exclusively within the first category, the NLRA would not be implicated. "[A]n employer

15

has the right to 'make a prediction as to the precise effects he believes unionization will have on his company.'" *Be-Lo Stores*, 126 F.3d at 285 (quoting *Gissel*, 395 U.S. at 618).

Thus, our analysis focuses on whether the statement, under the "totality of the circumstances," could objectively be perceived as a threat. *Intertape Polymer Corp.*, 801 F.3d at 230 (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir. 1985)). Under this standard, it becomes clear that the NLRB had substantial evidence to conclude that Garten crossed the line. While he contends that the sentence can only logically be interpreted as hyperbole or opinion because he had *already* doled out raises, *see* Opening Br. at 5, 14, Garten's prior actions are inapposite. Wage increases were not on a regular schedule and were not then subject to collective bargaining. As the company's owner, Garten's discretion was substantial, if not plenary; he could easily withhold future wages on a whim, and his employees would readily know this. In textually linking employees' raises to the activities of the Union, Garten improperly implied that union efforts had previously impacted wages and that future organizing activity would have the same negative effect. This was not a general statement that unionizing is bad for business. *See, e.g.*, *Pirelli*, 141 F.3d at 516; *Be-Lo Stores*, 126 F.3d at 285-86. Rather, the NLRB presented substantial evidence that this is the paradigmatic *quid pro quo* that neither the NLRA nor traditional campaign-speech doctrine protects: the evidence showed that Garten's speech attempted to secure a particular course of employee action not by mere persuasion, but by intimidation and coercion.

Furthermore, given Garten's level of control over the business, it is unsurprising that some employees responded positively to his message. Indeed, feeling compelled to

16

placate economic decision-makers is what the NLRA seeks to avoid. Thus, the Board could permissibly view the employees' responses as false positives, a symptom of unfair labor practices rather than a genuine sign that the message was not coercive.

For the foregoing reasons, we hold that the NLRB had substantial evidence to find a Section 8(a)(1) violation on these facts. Accordingly, we deny the petition and grant the Board's cross-petition for enforcement.

*PETITION DENIED AND CROSS-PETITION FOR ENFORCEMENT GRANTED*