[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Rudduck*, Slip Opinion No. 2026-Ohio-1126.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1126

DISCIPLINARY COUNSEL *v.* RUDDUCK.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Rudduck*, Slip Opinion No. 2026-Ohio-1126.]

*Judges—Alleged misconduct—Alleged violations of Code of Judicial Conduct based on judge's personal Facebook activity—Jud.Cond.R. 4.1(A)(3) violates First Amendment to United States Constitution because it is a content-based restriction on political speech and does not satisfy strict scrutiny—Complaint dismissed.*

(No. 2025-0203—Submitted March 11, 2025—Decided April 2, 2026.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-015.

_____

KENNEDY, C.J., authored the opinion of the court, which DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ., joined. FISCHER, J., dissented, with an opinion. BRUNNER, J., did not participate.

**KENNEDY, C.J.**

{¶ 1} Respondent, John William Rudduck ("Rudduck"), of Wilmington, Ohio, Attorney Registration No. 0006233, was admitted to the practice of law in Ohio in 1976, and his attorney registration is currently inactive.

{¶ 2} In a June 2024 complaint, relator, disciplinary counsel, charged Rudduck, then a Clinton County Common Pleas Court judge, with violating the Code of Judicial Conduct based on his activity on his personal Facebook page through which he endorsed his son, Brett Rudduck, for a seat on the Clinton County Municipal Court. Rudduck was tagged in Facebook posts endorsing Brett, shared many of those posts, and in one instance, posted a lengthy essay defending himself and members of his family, including Brett, on his Facebook page.

{¶ 3} A panel of the Board of Professional Conduct found that Rudduck had committed the charged misconduct and recommended that this court publicly reprimand him and order him to remove all posts referred to in the panel's report within ten days of the court's decision. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. The parties jointly waived any objections. However, we note that "as the ultimate arbiter of misconduct and sanctions in disciplinary cases, this court is not bound by factual and legal conclusions drawn by either the panel or the board." *Disciplinary Counsel v. Kelly*, 2009-Ohio-317, ¶ 11.

{¶ 4} Before us is the question whether Rudduck's Facebook activity while serving as a judge violated Jud.Cond.R. 1.2 (requiring a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary), 1.3 (prohibiting a judge from abusing the prestige of his or her judicial office to advance the personal or economic interests of the judge or others), and 4.1(A)(3) (prohibiting a judge from publicly endorsing or opposing a candidate for another public office).

{¶ 5} Starting with Jud.Cond.R. 4.1(A)(3), we conclude that the rule prohibits "speech that is 'at the core of our First Amendment freedoms'—speech about the qualifications of candidates for public office," *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002), quoting *Republican Party of Minnesota v. Kelly*, 247 F.3d 854, 861 (8th Cir. 2001). And as a content-based restriction on political speech, the bar against judges endorsing judicial candidates does not withstand strict scrutiny, as it is not narrowly tailored to serve a compelling state interest, *see Disciplinary Counsel v. Grendell*, 2025-Ohio-5239, ¶ 25, 80. We therefore hold that Jud.Cond.R. 4.1(A)(3) violates the First Amendment to the United States Constitution and, therefore, a violation of the rule cannot serve as a basis for discipline. And because the violation of Jud.Cond.R. 1.2 found by the board in this case was premised on its finding of a violation of Jud.Cond.R. 4.1(A)(3), the Jud.Cond.R. 1.2 violation also cannot serve as a basis for discipline.

{¶ 6} Further, upon a review of the facts and our caselaw, we conclude that Rudduck's Facebook activity did not violate Jud.Cond.R. 1.3.

{¶ 7} For these reasons, we dismiss the complaint.

### Facts and Procedural History

{¶ 8} Rudduck served as a judge in Clinton County for 39 years; his final term ended on December 31, 2024. At all times relevant to this case, Rudduck had a personal Facebook account and his profile identified him as a Clinton County Common Pleas Court judge. His Facebook page was set to be a public profile, meaning anyone could access his page and view its content.

{¶ 9} When a user logs into Facebook, he or she lands on a homepage, and on that homepage is a "feed" that contains a list of posts from "friends," groups that the user is in, and pages that the user follows. Facebook Help Center, *Your Home Page*, https://www.facebook.com/help/753701661398957?helpref=related_topics (accessed Dec. 19, 2025) [https://perma.cc/BAP3-WWK3]. The parties stipulated that when a user is "tagged" in a Facebook post by another person, that post may

appear on the user's Facebook page, depending on the user's privacy settings, and may be viewed by friends and others who visit the user's page. The parties also stipulated that a user may "share" a post appearing on the user's feed to distribute that post to friends and other groups.

{¶ 10} Rudduck's relevant Facebook activity falls into three categories: (1) sharing posts that his son Brett tagged him in, (2) sharing posts by nonfamily individuals, and (3) posting his own content on his Facebook page.

*Posts that Brett tagged Rudduck in and Rudduck then shared*

{¶ 11} In 2023, Brett decided to run in the Republican primary for a seat on the Clinton County Municipal Court that opened due to the death of the sitting judge. Brett's opponents in the primary were David Henry and Judy Gano.

{¶ 12} During his campaign, Brett wrote seven posts and tagged Rudduck in them, and those posts appeared on Rudduck's Facebook page.

{¶ 13} The first post included two photos of five children wearing Brett's campaign shirts and holding his campaign signs. In the first picture, the children are standing in a row, smiling, and holding the signs above their heads. In the second picture, the children appear to be roughhousing while holding the signs. The caption to the pictures read: "Expectations vs Reality . . . . I live it. I get it. Let me know if you would like a sign before they are all spoken for! (or destroyed)." (Ellipsis in original.) Rudduck shared the post.

{¶ 14} The second post contained a photo showing Brett in a suit with his wife and their three children, who are wearing Brett's campaign shirts. The caption read: "As I am famously known for, I turbo-talked my way through my Five-Minute Speech at the Republican-Hosted event last night. Mangled-Messaging aside . . . it's still a start." (Ellipsis in original.) Rudduck shared the post and commented: "I heard [that] one candidate in an opening statement said the 'sole qualification' the other two candidates had to be Judge was their last name. Should I consider that a complement or an insult?"

{¶ 15} A third post was a photo of Brett in a Cincinnati Reds jacket kneeling behind a red campaign sign. The photo was captioned, "The Perfect Day for Rudduck Red!" Rudduck shared the post.

{¶ 16} The fourth post contained a photo of Brett, his wife, and their three children wearing campaign shirts and inserting pretend ballots into a homemade ballot box. Brett captioned the post, "Don't forget about Early Voting!!!" Rudduck shared the post.

{¶ 17} The fifth post was posted in response to a 27-second video of Henry, one of Brett's opponents, speaking at a campaign event. Henry claimed that he was the only candidate not related to a judge. Brett's rebuttal post to the video stated:

> While most of the recent attacks on me have been unrelentingly personal in nature, the more civil and appropriate criticism has tended to be centered around my lack of relevant qualifications.
>
> As the elected law director for the city of Wilmington, I hired David Henry as my assistant law director and city prosecutor because I obviously found him undoubtedly qualified for the position. I also firmly believe he is qualified to be a judge.
>
> When Mr. Henry began his campaign claiming the other two candidates believed their "sole qualification" for being a judge was their "last name," I was stunned.
>
> When he later encouraged an individual in a private text message to publicly share misleading and unflattering information, I was shocked.
>
> When he declined to respond to my attempt to discuss the error, I was disappointed.

I encourage you to view the video and then review a brief summary of my actual qualifications by clicking the link below and in the comments.

Vote BRETT RUDDUCK for judge on May 2.

(Capitalization in original.)  Rudduck shared Brett's rebuttal post.

{¶ 18} A sixth post included a photo of two gymnasts, one balancing on the other's hand, wearing Brett's campaign shirts.  The photo was captioned: "One thing that is true in both one's judicial philosophy and elite gymnastics? BALANCE is Key."  (Capitalization in original.)  Rudduck shared the post.

{¶ 19} Brett's seventh post showed a photo of his wife behind a campaign sign.  Rudduck shared the post.

*Rudduck's sharing of posts from nonfamily individuals*

{¶ 20} Other people made posts about Brett's campaign on Facebook that Rudduck shared or that otherwise appeared on his page.

{¶ 21} Monika Davis posted a picture of Brett's campaign flyer beside a statement of Brett's accomplishments and affiliations, and she captioned the photo "Vote Brett Rudduck for Municipal Court Judge this May!  Share and vote." Rudduck shared the post.

{¶ 22} Rick Crabtree posted a photo of Brett's campaign signs in front of a home.  The photo was captioned as follows:

A friend of ours is running for judge.  It's so different knowing a person running for an elected position personally, and knowing he is a good person.  Brett did our adoption when I adopted Addy and we've been friends since.  Love this guy.

Good luck Brett Rudduck, we're rooting for you.  Looking forward to rocking those t-shirts.

> Words I never even thought of saying before but here we are,
> life is good.

Rudduck shared the post.

{¶ 23} Tyler McCollister posted a photo of Brett's campaign sign captioned, "Representing in Blanchester." Rudduck shared the post.

{¶ 24} Seth Cunningham wrote a lengthy post discussing his personal relationship with Brett, outlining Brett's characteristics, and explaining why he endorsed Brett to be the municipal-court judge. The stipulations do not say that Rudduck shared the post, but it appeared on his Facebook page.

{¶ 25} Justina Davidson responded to a post on Rudduck's Facebook page by commenting: "So glad I got to listen to Brett's speech! Now I know for sure that I will be voting for Brett Rudduck for Municipal Court Judge!" Brett responded to the comment, "[Thank you], young lady!"

*Rudduck's posts*

{¶ 26} On April 25, 2023, Rudduck posted a link to a WNEWSJ.com biography entitled "Clinton Co. Municipal Court Judge candidate: Brett Rudduck—Wilmington News Journal." Brett's headshot appeared next to the text.

{¶ 27} On April 26, 2023, within a week of the primary election, Rudduck posted a screenshot showing that Brett's Facebook account had been restricted because his activity "didn't follow [Facebook's] Community Standards." Rudduck wrote: "No—this is not the message I woke up to today—but rather my son. I understand if folks complain about account activity, Facebook places restrictions on free speech. Odd this would occur just before election day and without just cause."

{¶ 28} Craig Dawley commented on the post, stating: "This means you're a rebel. . . . I put a post on Facebook about a vac case tractor and the[y] fact check[ed] it. Said there wasn't correct information haha." Rudduck replied:

No Craig—not me. Not my son. Not anyone in my family. My son is running for election and his opposition has apparently convinced [Facebook that] his posts do not meet community standards. I hope the community we know disagrees. He is investigating the reason for the ridiculous action taken and I am sure will keep people informed—if allowed to update. This is serious stuff going on in Clinton County.

{¶ 29} The same day that Brett's Facebook account was restricted, Rudduck authored and posted to his Facebook page a lengthy four-part essay. Some background is needed before we set forth the essay here.

{¶ 30} Rudduck testified at his disciplinary hearing that he had granted a foreclosure against a person named Tony Thomas, whose family was subsequently evicted from their home. According to Rudduck, Thomas bore a grudge against him and used social media to post "[h]orrific things" about him. For example, Thomas posted that Rudduck should go to prison and described what would happen to him in prison. Thomas also maligned Rudduck's wife, brother, and nephew. And he accused Brett of abusing his children, being a child pornographer, and colluding with the police department to avoid charges. Rudduck said that these accusations appeared on a website that Thomas administered with Darrell Petrey. According to Rudduck, Henry, one of Brett's opponents in the primary, relied on a taped telephone conversation between Brett and Petrey to suggest that Brett had been using illicit drugs.

{¶ 31} Rudduck testified that his posts were made in response to Thomas's posts. He said: "[I wanted] to show the public that I'm proud—given the firestorm that ha[d] occurred . . . during this period of time, the damage in mental health that

was happening to my family, I wanted to indicate to them that I was proud of my son."

{¶ 32} Rudduck's four-part essay, which acknowledges the campaign and defends Brett against various accusations, reads as follows:

> There are more important things in life than winning an election. Faith, family, friends, community, reputation, and honesty, to name a few. Since 1985 when I first ran for judicial office, these "more important things" have been a cornerstone of our community. We now live in a different era.
>
> I have previously called the Ohio Supreme Court before posting this message to the community. A representative of the Supreme Court advised me the only way to respond to misleading information in judicial campaigns is through free speech. Just today, Facebook restricted my son, Brett Rudduck, from exercising his right to free speech by precluding him from posting on Facebook, citing a violation of "community standards" without any explanation or details a mere five days from Election Day. Given Brett is precluded from posting, in defense of my family's integrity and reputation and for the benefit of the community, I am exercising my right to free speech to set some records straight.
>
> This message will be long; many will not read it because of its length, but those who do, please understand the purpose is not about "winning an election" but rather to counter a narrative and to reveal facts and personal information known only by a few. Truth is always the best antidote for lies. But on social media, it is hard to discern the truth and even harder to discern whether truth is still paramount in our society!

Throughout the latest judicial campaign, the entire Rudduck family, not just the candidate running for office, has been targeted and attacked. I am all too familiar with these attacks, as you will learn if you read this entire message. But on sites such as Citizens Arrest of Clinton County, Ohio, administered by Darrell Petrey and Tony Thomas, and Wilmington Ohio Crime Concerns, my wife is being called an alcoholic; my brother is being maligned for his work as a Superintendent at Clinton Massie; my nephew is being characterized cruelly and maliciously. And my son, well, the number of attacks he has shouldered since 2018 by Mr. Petrey and Mr. Thomas and others in less public ways would be impossible to quantify.

While most of the participants on these sites are earnest in their desire to make our community better, the divisive messages allowed to be shared on the sites are more harmful than they may realize. Folks with different views are sometimes blocked from commenting, just as my son experienced today, and cannot defend themselves. The record needs to be corrected.

PART ONE—Allegations of child abuse

Mr. Thomas and Mr. Petrey posted pictures of my son playing with his two young boys in his own backyard on some of these sites with allegations that my son was throwing hammers at them and needed to be investigated for child abuse. In fact, Mr. Thomas contacted the police department and Children's Services, explicitly seeking an investigation for child abuse be conducted. Mr. Thomas was unwilling to share the identity of the person taking the pictures, how they were obtained, or any other information to confirm his charges. Therefore, no investigation was pursued.

10

These allegations would be laughable to most, but they fed into the idea authority figures in our county were not investigating elected public officials for criminal behavior, a theory Mr. Thomas especially was advancing. When no one in authority acted upon the lies, the attacks became more volatile, vulgar, and targeted, as those attending regular Wilmington City Council sessions should attest.

The lies and pictures were even posted on the Wilmington Police Department Facebook page by a police officer named Scott Baker while he was on paid suspension from the department. Those posts are still on the official page. This act alone caused our entire family unbelievable stress, pain, and distress.

PART TWO—Taped audio phone conversation

On September 8, 2022, Judge Michael Daugherty suddenly passed away; the community mourned and came together to support his entire family. My son was heartbroken. On September 22, 2022, my son called Mr. Petrey, a high school classmate and administrator of one of the sites that controlled postings, in a second attempt to have the images of his children removed. Brett also wanted to notify him of death threats made against Brett contained in comments on a specific post moderated by Mr. Petrey.

Drug usage issues surfaced quickly in this taped fifteen-minute conversation, which I first listened to this week. I learned my son was admittedly drunk, and I knew he was still mourning the death of Judge Daugherty in the midst of the unwarranted attacks on himself and his family. He knew Mr. Petrey was taping the phone conversation but emotionally and embarrassingly used language that offended his Mother, me, and I am sure most who listened to the recording.

Mr. Petrey declined to remove the posts, ultimately switching the subject of the conversation to the alleged widespread corruption he believed he, Mr. Thomas and his followers were uncovering throughout the county. I am proud my son went on to defend the reputations of those other elected public officials Mr. Petrey and Mr. Thomas were and are still trying to destroy. Brett also indicated early in the conversation he was proud he "had not used a single drug" for one-and-one-half years.

In 2003, my son was diagnosed with ADHD [Attention Deficit Hyperactivity Disorder] and prescribed Adderall. This legal, prescription drug is and was a standard treatment for individuals diagnosed with ADHD. My son has been using this legally prescribed medication ever since. Throughout the entire period, despite having some concerns about the treatment, several physicians continued to treat Brett's condition by prescribing Adderall. More recently, one particular physician, a clinical psychiatrist, specifically indicated he would never prescribe Adderall for ADHD, a position Brett eventually adopted.

In 2021, my son sought treatment to wean himself from this addictive drug, Adderall. A recent article in The Atlantic titled "Why adult ADHD is so complicated" ably expresses the concerns of individuals who are prescribed this legal drug. Neither our family nor Brett ever attempted or desired to keep his battle with ADHD and his use of Adderall a secret; we also gratefully shared the good news his treatment was successful, as he has not used Adderall for the time period he mentioned in the tape recording. Given their close working relationship, Brett shared this very personal information regarding his treatment with Mr. Henry.

12

Recently, someone provided Mr. Henry with the taped telephone conversation via private message to his judicial candidate's Facebook account. In response, through a private message now shared on social media, Mr. Henry indicated he would be sending the taped conversation to both law enforcement authorities and the Ohio Supreme Court "the next day," implying there was something decidedly criminal about my son's statement of not using "a single drug" for one-and-one-half years. Mr. Henry specifically characterized that "single drug" as "illicit."

In listening to the audio recording, I understand how members of the public could jump to the conclusion that Brett was admitting to using something other than his previously prescribed Adderall. However, with Mr. Henry's prior personal knowledge of Brett's medical treatment for ADHD, it makes one question the purpose of Mr. Henry encouraging the recipient of the private message to "share your findings with everyone you speak with so the public is aware." Mission accomplished?

Brett attempted to contact Mr. Henry to address Mr. Henry's now public, private message. Mr. Henry never responded. As Brett proudly stated in the recorded private conversation, he has been off Adderall for nearly two years. No one addicted to drugs, legal or illegal, especially those who have recovered, should be stigmatized or afraid to seek treatment or punished for doing so. I fear people will be deterred from seeking help given the small but vocal intent of fostering anger and division.

PART THREE—Allegations against family

I will not spend much time considering the suggestion my son needs to be criminally investigated for throwing hammers at his

sons or any other allegations that constantly emerge on social media. But those posts are still out there and should be taken down. Nor will I address the reported number of DUIs for which I have somehow escaped prosecution (or have been convicted of, last reported to be twelve in number) other than to say I have never been stopped for a DUI nor had lunch at a local restaurant three times a week with my son where we allegedly staggered out, cross-eyed and drove back to work. As for my wife, she seldom drinks and is most certainly not an alcoholic. My brother has been in the education field all his life. He served the East Clinton and Clinton Massie school districts with distinction, leaving each in exceptional shape before being elected to serve on the state Board of Education. And my nephew, well on his way to recovering from his current diagnosis of Hodgkin's Lymphoma, is a man with such a bright future undeserving of being attacked and thrust into this judicial campaign—no wonder good people do not want to run for public office.

PART FOUR—Mr. Thomas's foreclosure

Concerning Mr. Thomas, while I can't speak to his motivation for attacking our family, I granted what is called a Summary Judgment in foreclosure, resulting in the eviction of Mr. Thomas from his home, a decision he has repeatedly claimed was unjust and criminal. The central allegations made by the bank included Mr. Thomas had failed to make his mortgage payments over a period of years. In Summary Judgment proceedings, we need not have record hearings where testimony is provided IF facts are undisputed. The case can be resolved on the legal filings only. That is what happened in the foreclosure case. It was undisputed Mr.

Thomas did not make his payments for a period of years. Privately retained legal counsel represented Mr. Thomas and chose not to appeal the court's Judgment finding Mr. Thomas should be evicted.

Since that day, Mr. Thomas has filed multiple disciplinary complaints against me and my son, all summarily rejected by the Ohio Supreme Court. He has repeatedly maligned my character and my son's character on social media and denigrated my service as a military policeman in the U.S. Army from 1971-1973. If you are a Marine, please know every chance he gets, Mr. Thomas uses the opportunity to promote his service to our country as an argument supporting his claims and to bolster his credibility.

Unless good people stand up for the truth when it is objectively demonstrated, I fear our democracy is in danger. I never expected it to be an issue in our beloved county, but it is clearly here and caused division which pains most of us.

CONCLUSION

I began this message by stating there are more important things in life than winning an election. I advised my son I would "go public" with these things regardless of the political consequences for him or me because I felt I had a duty to speak out to inform the public of things that transcend this election cycle and need to be stopped. This became even more necessary when Facebook inexplicably blocked him from posting. Social media can be a great force for good, as was demonstrated when my wife's dog was lost, only to be found with the unbelievable help of the community; it can also cause great harm and personal pain if used indiscriminately and is immune from any form of accountability.

(Capitalization in original.)

*Disciplinary proceedings*

{¶ 33} In June 2024, disciplinary counsel filed a complaint alleging that Rudduck had violated Jud.Cond.R. 1.2, 1.3, and 4.1(A)(3). Disciplinary counsel and Rudduck entered into stipulations of facts.

{¶ 34} After a hearing, the panel found by clear and convincing evidence that Rudduck had violated these rules and it recommended that Rudduck receive a public reprimand based on the charged violations and the aggravating and mitigating factors it found applicable. The panel further recommended that Rudduck be ordered to remove the posts at issue from his Facebook page. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 35} The parties do not contest the board's finding that Rudduck's Facebook activity included a judge's endorsement of a candidate for another political office in violation of Jud.Cond.R. 4.1(A)(3), that that same conduct constituted a violation of Jud.Cond.R. 1.2, and that Rudduck's lengthy Facebook essay abused the prestige of his judicial office in violation of Jud.Cond.R. 1.3. Nor has Rudduck claimed that his speech was protected by the First Amendment to the United States Constitution.

{¶ 36} We ordinarily decide only those questions presented by the parties. *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 15. But this is not an ordinary case.

{¶ 37} Importantly, only this court has the authority to regulate matters relating to the practice of law in Ohio. Ohio Const., art. IV, § 2(B)(1)(g). Only this court is charged with promulgating "rules governing the admission to the practice of law and discipline of persons so admitted." Ohio Const., art. IV, § 5(B). "[I]t is this court, not the board"—and not the parties—"that is the ultimate arbiter of

the facts of the case, the law that applies to the facts, and the discipline that should be imposed." *Disciplinary Counsel v. Warner*, 2024-Ohio-551, ¶ 9.

{¶ 38} However, our power to regulate the practice of law is not absolute. *Shimko v. Lobe*, 2004-Ohio-4202, ¶ 27. "This court may no more disregard or infringe upon the constitutional rights of our citizens in the exercise of its regulatory functions than may any other branch of government." *Id.* The "'[r]ules adopted by this court in an administrative capacity must comply with the state and federal constitutions like any other rules.'" *Id.*, quoting *Christensen v. Bd. of Commrs. on Grievances & Discipline*, 61 Ohio St.3d 534, 537 (1991).

{¶ 39} "Because it is our own rule[s] that [are] at issue, we are obligated in the first instance to ensure that the rule[s] comport[] with constitutional guarantees." *In re Application of Jones*, 2018-Ohio-4182, ¶ 34 (DeWine, J., concurring in judgment only). Consequently, we consider whether Rudduck's actions implicate the First Amendment and must draw our own conclusion regarding whether he may be disciplined for violating the judicial-conduct rules.

### Law and Analysis

*The prohibition on endorsements by judges*

{¶ 40} Jud.Cond.R. 4.1(A)(3) provides, "A judge or judicial candidate shall not . . . [p]ublicly endorse or oppose a candidate for another public office." The word "endorse" means "to express definite approval or acceptance of . . . : support or aid explicitly by or as if by signed statement : vouch for." *Webster's Third New International Dictionary* (2002). "'Endorsement' connotes an expression or demonstration of approval or support." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 763 (1995) (plurality opinion).

{¶ 41} The board found that Rudduck violated Jud.Cond.R. 4.1(A)(3) and that by violating Jud.Cond.R. 4.1(A)(3), Rudduck also violated Jud.Cond.R. 1.2 by posting on Facebook about Brett's campaign. That latter rule requires a judge to "act at all times in a manner that promotes public confidence in the independence,

integrity, and impartiality of the judiciary, and [to] avoid impropriety and the appearance of impropriety."

{¶ 42} Lastly, Jud.Cond.R. 1.3 prohibits a judge from "abus[ing] the prestige of judicial office to advance the personal or economic interests of the judge or others." In its report, the board premised a violation of this rule, in part, on Rudduck's "effort to address allegations made against Brett and to rehabilitate Brett's character just days before the election."

{¶ 43} The board's conclusion that Rudduck violated these rules, then, is based in whole (Jud.Cond.R. 4.1(A)(3) and 1.2) or in part (Jud.Cond.R. 1.3) on its finding that Rudduck endorsed his son's political campaign. Mindful that we are the ultimate arbiter of the facts and the law in a disciplinary case, we ask first whether Rudduck's Facebook activity in fact included endorsements in violation of the Code of Judicial Conduct.

{¶ 44} At his disciplinary hearing, Rudduck denied that he had endorsed his son's candidacy for office or that he had intended to endorse Brett's campaign. In support of his denial, he noted that he had never told anyone to vote for Brett and maintained that all he had done was show support for his son who was being attacked on social media.

{¶ 45} As noted above, an endorsement is an expression of approval or support. It does not appear that any court has squarely addressed the question whether sharing or reposting a candidate's campaign-related post on social media constitutes an endorsement of that candidate for office. Nonetheless, "sharing a video on social media often implies an endorsement of the content shared." *Davis v. Cisneros*, 744 F.Supp.3d 696, 737, fn. 16 (W.D.Tex. 2024).

{¶ 46} Looking at the context of Rudduck's Facebook activity, we conclude that Rudduck endorsed his son's judicial campaign by sharing and commenting on Brett's campaign-related content. *See Bland v. Roberts*, 730 F.3d 368, 386 (4th

18

Cir. 2013) (liking a political candidate's campaign page on Facebook "is the Internet equivalent of displaying a political sign in one's front yard").

{¶ 47} A reasonable person would believe that Rudduck approved and supported his son's candidacy for judge. Both Rudduck's name and Brett's campaign material were displayed prominently next to each other on Rudduck's Facebook page, and the posts depict Brett's campaign in a positive light. For example, Rudduck shared pictures of his family, including young children, wearing campaign attire and with campaign yard signs. He also shared a news article about Brett's candidacy. And Rudduck's comments plainly supported Brett when he thanked a constituent for her support and when he defended Brett against political attacks and against Facebook's decision to restrict Brett's Facebook account right before election day.

{¶ 48} Rudduck did not have to say "I endorse Brett" or "Vote for Brett" to get across his approval of Brett's candidacy. No reasonable person would believe that Rudduck did not intend to support his son's campaign when he shared positive campaign-related content. We therefore conclude that Rudduck's Facebook activity was an endorsement of Brett's candidacy for judge.

{¶ 49} Having decided that Rudduck endorsed his son's campaign, we turn next to the question whether this court may prohibit a sitting judge from publicly endorsing a candidate for political office. That analysis begins with the First Amendment to the United States Constitution.

*The First Amendment*

{¶ 50} The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech." That prohibition applies to the states through the adoption of the Fourteenth Amendment. *Stromberg v. California*, 283 U.S. 359, 368 (1931) ("the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech").

{¶ 51} "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm.*, 558 U.S. 310, 339 (2010). Therefore, "[t]he First Amendment '"has its fullest and most urgent application" to speech uttered during a campaign for political office,'" *id.*, quoting *Eu v. San Francisco Cty. Democratic Cent. Commt.*, 489 U.S. 214, 223 (1989), quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), as that helps safeguard the "right of citizens to choose who shall govern them," *McCutcheon v. Fed. Election Comm.*, 572 U.S. 185, 227 (2014) (plurality opinion). Because "political speech must prevail against laws that would suppress it," laws burdening political speech are subject to strict scrutiny. *Citizens United* at 340. That means that the law must be narrowly tailored to further a compelling governmental interest. *Id.*

{¶ 52} In addition, the State "'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Gilbert*, 576 U.S. 155, 163 (2015), quoting *Chicago Police Dept. v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

{¶ 53} Jud.Cond.R. 4.1(A)(3) burdens core political speech by prohibiting endorsements by judges, i.e., "speech about the qualifications of candidates for public office," *White*, 536 U.S. at 774; *see also Eu* at 222-224 (banning endorsements of primary candidates burdens freedom of speech); *Sanders Cty. Republican Cent. Commt. v. Bullock*, 698 F.3d 741, 745 (9th Cir. 2012) ("political speech—including the endorsement of candidates for office—is at the core of speech protected by the First Amendment"). Jud.Cond.R. 4.1(A)(3) is also a

content-based prohibition on speech—it prohibits a judge from expressing approval for or opposition to a candidate for another political office.

{¶ 54} Consequently, strict scrutiny applies in determining whether the rule violates the First Amendment. We therefore ask whether Jud.Cond.R. 4.1(A)(3)'s bar against judges endorsing other candidates for public office is narrowly tailored to serve a compelling state interest.

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

*Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc).

### Jud.Cond.R. 4.1(A)(3)

{¶ 55} Canon 4 of the Code of Judicial Conduct provides that "[a] judge or judicial candidate shall not engage in political or campaign activity that is inconsistent with the independence, integrity, or impartiality of the judiciary." The canon itself identifies the state interests it advances: ensuring the independence, integrity, and impartiality of the judiciary.

{¶ 56} We start with impartiality. In *Grendell*, we recognized that there is a compelling state interest in ensuring against judges who are biased for or against a particular party to a case before them. *Grendell*, 2025-Ohio-5239, at ¶ 32. We also acknowledged the compelling state interest in preventing the *appearance* of judicial bias for or against a party. *Id*. at ¶ 48. But it is not obvious that a prohibition on endorsing or opposing a candidate for public office meaningfully advances

either of those interests. Both come into play only when the endorsed or opposed candidate for public office is also a party to a case before the judge or likely will be. In any case, Jud.Cond.R. 4.1(A)(3) sweeps in much more speech than endorsements or opposition aimed at parties to a particular case—it bars speech by a judge about all candidates for public office (other than speech about the judge him or herself or about his or her own opponent). It therefore prohibits a judge from endorsing or opposing candidates who would likely never be litigants before the judge, such as candidates for another judicial seat or family members of the judge. That is important here; it is highly unlikely that Rudduck would have heard a case in which his son was a party—Jud.Cond.R. 2.11(A)(2) requires a judge to disqualify him- or herself in a proceeding when the judge knows that a party or an attorney in the proceeding is within the third degree of relationship to the judge. Therefore, to the extent Jud.Cond.R. 4.1(A)(3) advances the State's interest in ensuring an impartial judiciary and the public confidence in an impartial judiciary, it is vastly overinclusive.

{¶ 57} Nor is a prohibition on a judge's endorsement of or opposition to candidates for public office the least restrictive alternative. As we noted in *Grendell* with regard to Jud.Cond.R. 3.2 (which prohibited judges from voluntarily appearing before a governmental body, except in certain circumstances), there are a variety of alternatives that are less restrictive on speech than a ban on speech, including the mandatory recusal of a judge when his or her "impartiality might reasonably be questioned," Jud.Cond.R. 2.11(A), and the removal of a judge who refuses to recuse in an affidavit-of-disqualification proceeding under R.C. 2701.03 and other statutes. *See Grendell* at ¶ 42-43. "Subsequent recusal"—or disqualification—"is a far less restrictive means than a broad-reaching, upfront prohibition." *Id.* at ¶ 43.

{¶ 58} According to the dissent, subsequent recusal is not a viable less restrictive alternative, and the dissent presents a hypothetical in which all judges on

a county's court of common pleas publicly endorse a candidate for county prosecutor, who subsequently wins office. Dissenting opinion, ¶ 122. The judges would have to recuse in any case brought by the prosecutor, the dissent says, thereby "reduc[ing] the workload for those judges and requir[ing] the inefficient and potentially costly appointment of visiting judges." *Id.*

{¶ 59} However, "'[t]he First Amendment does not permit the State to sacrifice speech for efficiency.'" *Natl. Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755, 775 (2018), quoting *Riley v. Natl. Fedn. of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). And the proponent of enforcing a restriction on speech must do more than "show that a proposed less restrictive alternative has some flaws," *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 669 (2004), or imposes some cost.

{¶ 60} In any case, the dissent's hypothetical is unlikely to occur. The Code of Judicial Conduct bars judges from engaging in extrajudicial activities that "will interfere with the proper performance of the judge's judicial duties," Jud.Cond.R. 3.1(A), or that "will lead to frequent disqualification of the judge," Jud.Cond.R. 3.1(B). So the conduct at issue in the dissent's hypothetical is already covered by the judicial-conduct rules.

{¶ 61} And the dissent underestimates how demanding the strict-scrutiny standard is. In fact, in the First Amendment context, the United States Supreme Court has "held only once that a law triggered but satisfied strict scrutiny—to uphold a federal statute that prohibited knowingly providing material support to a foreign terrorist organization." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 484 (2025). And the case in which the law was upheld "involved an unusual application of strict scrutiny," *id.*, because the Court's analysis relied on the deference due to the executive branch's evaluation of the facts in the realm of national security and foreign affairs. Our rule banning public endorsements by

judges is not like those "truly extraordinary circumstances," *id.* at 485, in which a ban on fully protected speech is constitutional.

{¶ 62} Next we consider the State's interest in ensuring the independence of the judiciary. Judicial independence includes the structural independence of the judiciary as one of the three branches of power in the tripartite-government scheme created by the Ohio Constitution. But in *Grendell*, we rejected the idea that limits on judges' speech were needed to maintain the separation of powers—"a speech restriction doesn't protect against one branch of government *exercising the power* of another" (emphasis in original), *Grendell*, 2025-Ohio-5239, at ¶ 53. Maintaining structural independence "is not the sort of state interest that can be used to justify a restriction on speech," *id.* at ¶ 57.

{¶ 63} Then there is the independence of the judge him or herself. The United States Court of Appeals for the Sixth Circuit has said that a state has a "compelling interest in keeping its judges above the partisan fray of trading political favors." *Winter v. Wolnitzek*, 834 F.3d 681, 691 (6th Cir. 2016). Judges "are supposed to follow the rule of law—no matter current public opinion, no matter the views of the political branches, no matter the views of the parties that support them." *Id.* at 695. The Sixth Circuit panel in *Winter* went on to hold that Kentucky's version of Jud.Cond.R. 4.1(A)(3) withstood strict scrutiny because "[a] ban on such endorsements . . . guards against the risk that, once a judge is elected, he will not be able to (and he will not be perceived as being able to) referee disputes involving elected officials he did or did not endorse." *Id.* at 691-692. In doing so, however, the panel adopted an extremely narrow construction of Kentucky's endorsement-ban provision, distinguishing endorsements from "expressions of agreement with a political party's platform or another candidate's views," *id.* at 691. The panel found unconstitutional a related Kentucky provision that prohibited judicial candidates from making speeches for or against a political party or candidate. *Id.* at 689-690. A different Sixth Circuit panel later applied *Winter* in

holding that Jud.Cond.R. 4.1(A)(3) is constitutional. *Platt v. Bd. of Commrs. on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 263 (6th Cir. 2018).

{¶ 64} A judge's personal independence is necessarily closely related to the judge's impartiality. And we have already rejected the proposition that a ban on endorsing or opposing a candidate for public office is narrowly tailored to advance the State's interest in ensuring judicial impartiality and the appearance of impartiality. Our analysis there applies equally here: Jud.Cond.R. 4.1(A)(3) is overinclusive in that it bans speech about candidates who will never be parties before the judge and there are less restrictive alternatives, such as recusal and disqualification. Seeking to uphold a judge's personal independence from other political actors is no different. We therefore disagree with the Sixth Circuit's conclusion in *Platt* that the rule's ban on endorsements by judges is constitutional.

{¶ 65} Lastly, we consider the State's interest in maintaining the integrity of the judiciary. We have recognized that the State's interest in judicial integrity is compelling. *In re Judicial Campaign Complaint Against O'Toole*, 2014-Ohio-4046, ¶ 26; *see also Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445 (2015) (recognition of same by the United States Supreme Court). Corruption is the antithesis of integrity, *see Black's Law Dictionary* (12th Ed. 2024) (entry for "corruption"), so maintaining judicial integrity involves preventing judicial corruption. Importantly, the United States Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *Fed. Election Comm. v. Cruz*, 596 U.S. 289, 305 (2022).

{¶ 66} Quid pro quo corruption is the exchange of an official act for something of value. *McCutcheon*, 572 U.S. at 192 (plurality opinion). And we understand that "[a]n endorsement is a thing of value: it may attract voters' attention, jumpstart a campaign, give assurance that the candidate has been vetted,

or provide legitimacy to an unknown candidate and indicate that he or she is capable of mounting a successful campaign." *French v. Jones*, 876 F.3d 1228, 1240 (9th Cir. 2017). But when campaign-speech regulations have been upheld as targeting quid pro quo corruption, "the speaker is not using speech to persuade action, but rather as a means of compelling action from a voter or candidate through reward, coercion, blackmail, bribery, or other corrupt methods." *Garten Trucking, L.C. v. Natl. Labor Relations Bd.*, 139 F.4th 269, 278 (4th Cir. 2025). The ban on endorsements by judges does not regulate that type of speech.

{¶ 67} In any case, Jud.Cond. 4.1(A)(3) is not narrowly tailored to advance the State's interest in maintaining judicial integrity and preventing judicial corruption. Jud.Cond.R. 4.1(A)(3) is not limited to prohibiting the endorsement of or opposition to a candidate for public office that amounts to corruption or that leads to the appearance of corruption. Instead, this ethics rule is overinclusive and restricts political speech when there is no quid pro quo exchange of something of value for an official act by the judge. An endorsement is not inherently corrupt— "'endorsements often are exchanged between political actors on a quid pro quo basis,'" *Platt*, 894 F.3d at 263, quoting *Winter*, 834 F.3d at 691. That is, endorsements are much more commonly made without the promise of an official act in exchange. Further, there are less restrictive alternatives: Jud.Cond.R. 4.1(A)(3) could have been drafted to restrict only endorsements that involve corruption or create the appearance of corruption. It was not.

{¶ 68} For these reasons, Jud.Cond.R. 4.1(A)(3) is not narrowly tailored to serve the State's interest in maintaining judicial independence, integrity, and impartiality. Simply put, the rule sweeps too broadly and chills an unacceptable amount of core political speech. Since Jud.Cond.R. 4.1(A)(3) cannot survive strict scrutiny, we decline to enforce it in this case.

{¶ 69} In addition, the board found that Rudduck's public endorsements of Brett violated Jud.Cond.R. 1.2, which, again, states that "[a] judge shall act at all

times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." The board relied on Comment [5] to this rule, which states that an appearance of impropriety involves a reasonable perception that a judge has violated the Code of Judicial Conduct. It therefore wrote in its report, "Having concluded that [Rudduck] violated Jud.Cond.R. 4.1(A)(3), we also conclude that [Rudduck] violated Jud.Cond.R. 1.2."

{¶ 70} We have determined that Jud.Cond.R. 4.1(A)(3) is unconstitutional, so a violation of it cannot serve as the predicate for finding that Rudduck also violated Jud.Cond.R. 1.2. And to the extent that Jud.Cond.R. 1.2 prohibits the public endorsement of or opposition to a candidate for public office, it is unconstitutional in that it restricts core political speech without sufficient justification. The same analysis applies to the board's finding of a violation of Jud.Cond.R. 1.3, to the extent that finding was premised on Rudduck's endorsement of Brett. However, the board found that Rudduck violated Jud.Cond.R. 1.3 for other reasons, and we turn to those now.

*Jud.Cond.R. 1.3*

{¶ 71} Jud.Cond.R. 1.3 states that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so." The board concluded that Rudduck's four-part essay violated Jud.Cond.R. 1.3 by using the prestige of his judicial office to advance his and Brett's personal interests. The board noted in its report, "[Rudduck's] judicial philosophy was under attack, several members of his family were under attack, the election was only days away, and Facebook was the most effective way to quickly spread his message to his followers."

{¶ 72} In his essay, Rudduck mentioned his judicial office twice: first, in the introduction when he referred to his first campaign for judicial office, and

27

second, when he noted that he had ruled against Thomas in his foreclosure case and explained why.

{¶ 73} Jud.Cond.R. 2.10(E) expressly permits a judge to "respond directly or through a third-party to allegations in the media or elsewhere concerning the judge's conduct in a matter," so long as it does not impair the fairness of a pending or impending proceeding, *see* Jud.Cond.R. 2.10(A). So to the extent that the board relied on Rudduck's statements in response to "attacks" on his "judicial philosophy" to find that he violated Jud.Cond.R. 1.3, that reliance was improper. Further, because Rudduck was permitted under Jud.Cond.R. 2.10(E) to respond to allegations about his conduct in Thomas's foreclosure case, his reference to his judicial office in that circumstance was not an abuse of the prestige of his judicial office under Jud.Cond.R. 1.3.

{¶ 74} That leaves only Rudduck's reference to his prior judicial campaign. That, by itself, is not enough to demonstrate an abuse of the prestige of his judicial office. Comment [1] to Jud.Cond.R. 1.3 gives the archetypal example of when a judge abuses the prestige of his or her judicial office: "it would be improper for a judge to allude to his or her judicial status to gain favorable treatment in encounters with traffic officials." *See Disciplinary Counsel v. Doherty*, 2020-Ohio-1422 (concluding that a judge violated Jud.Cond.R. 1.3 by stating that she was a judge multiple times while interacting with an officer after a traffic accident); *Disciplinary Counsel v. Gonzalez*, 2020-Ohio-3259 (same while interacting with an officer during a traffic stop); *Disciplinary Counsel v. Williams*, 2017-Ohio-9100 (same while interacting with an officer during a traffic stop).

{¶ 75} Other disciplinary cases in which we have found violations of Jud.Cond.R. 1.3 involved circumstances in which judges inappropriately intervened in cases to further their personal interests. Recently, in *Disciplinary Counsel v. Kegley*, 2025-Ohio-910, the judge violated Jud.Cond.R. 1.3 by using his status as a judge to secure the release of his son from custody, even though his son's

release was contrary to the bond schedule the court had adopted. The judge expressly identified himself as a judge in his interaction with a corrections officer at the jail. Similarly, in *Disciplinary Counsel v. Goulding*, 2020-Ohio-4588, the judge violated Jud.Cond.R. 1.3 by ordering the release on bond of the boyfriend of his friends' daughter. The boyfriend was facing felony child-pornography charges, and his case was assigned to a different judge. In *Disciplinary Counsel v. Marshall*, 2019-Ohio-670, the judge violated Jud.Cond.R. 1.3 by making clear his status as a judge while injecting himself into his juvenile daughter's speeding case. And in *Disciplinary Counsel v. Hale*, 2014-Ohio-5053, the judge violated Jud.Cond.R. 1.3 by unilaterally dismissing a speeding ticket for his personal attorney.

{¶ 76} *Disciplinary Counsel v. Oldfield*, 2014-Ohio-2963, is instructive here. This court dismissed an allegation that the judge in that case violated Jud.Cond.R. 1.3 by merely saying that she was a judge during a traffic stop. The evidence in the case was contradictory, but according to the judge, she told an officer that she was a judge in response to the question whether she was a lawyer, and she told another officer that she was not seeking special treatment because she was a judge. This court found that those circumstances were insufficient to prove by clear and convincing evidence that the judge had abused the prestige of her judicial office, and we dismissed the count alleging a violation of Jud.Cond.R. 1.3.

{¶ 77} Here, Rudduck made the following statement in his essay before embarking on his defense of himself and his family: "There are more important things in life than winning an election. Faith, family, friends, community, reputation, and honesty, to name a few. Since 1985 when I first ran for judicial office, these 'more important things' have been a cornerstone of our community. We now live in a different era."

{¶ 78} Applying an objective standard, *see Oldfield* at ¶ 5, this statement does not create in reasonable minds a perception that Rudduck was improperly using his judicial position to gain favor. He merely mentioned his position in the

context of what was otherwise constitutionally protected speech defending himself and his family from allegations of wrongdoing on social media.

{¶ 79} Lastly, to the extent that the board found that Rudduck violated Jud.Cond.R. 1.3 by giving Brett a public endorsement, we reject that finding because, as discussed above in our analysis of Jud.Cond.R. 4.1(A)(3), such an application of Jud.Cond.R. 1.3 would violate the First Amendment.

{¶ 80} Thus, for lack of clear and convincing evidence, we dismiss the count alleging that Rudduck violated Jud.Cond.R. 1.3.

### A Word of Caution

{¶ 81} Lastly, although we conclude that Rudduck did not violate Jud.Cond.R. 1.2, 1.3, or 4.1(A)(3), that does not mean that we approve of his conduct. We recognize that it is highly unlikely that Rudduck would have heard a case in which his son was an attorney or a party in the matter. Nonetheless, judges are held to the highest standard of ethical conduct, *Warner*, 2024-Ohio-551, at ¶ 22, and judges must be cognizant of how their actions appear to the public. That may mean that a judge should forgo making some public statements even if those statements would constitute protected free speech. And here, it would have been far more prudent for Rudduck to have abstained from posting about his son's candidacy on social media and thereby avoided any question of the propriety of his actions.

### Conclusion

{¶ 82} Judges do not give up their First Amendment right to engage in political speech simply by assuming office. *See Grendell*, 2025-Ohio-5239, at ¶ 24. While we acknowledge that the State has a compelling interest in maintaining judicial independence, integrity, and impartiality, Jud.Cond.R. 4.1(A)(3) sweeps too broadly and restricts political speech beyond what is necessary to uphold those state interests. We therefore conclude that applying the rule against Rudduck would unconstitutionally infringe on his First Amendment rights.

{¶ 83} Additionally, we conclude that Rudduck's Facebook activity did not violate Jud.Cond.R. 1.2 or 1.3.

{¶ 84} Accordingly, we dismiss the complaint against Rudduck.

Judgment accordingly.

_____

**FISCHER, J., dissenting.**

{¶ 85} Today, this court, by majority vote, discards as facially unconstitutional Ohio's longstanding judicial anti-endorsement rule set forth in Jud.Cond.R. 4.1(A)(3), which prohibits judges and judicial candidates from publicly endorsing or opposing a candidate for another public office. No party to this action has argued that the anti-endorsement rule in Jud.Cond.R. 4.1(A)(3) is unconstitutional under the First Amendment to the United States Constitution; in fact, the parties *jointly waived* their right to file *any* objections to the findings of fact, conclusions of law, and recommended sanction of the Board of Professional Conduct. Nevertheless, without any input from, or notice to, the parties involved, the judges and judicial candidates in Ohio's 88 counties, the members of the Ohio bar, or the public at large, the court reaches its conclusion by going against established First Amendment case law.

{¶ 86} This court has the ultimate authority in Ohio over the practice of law and disciplinary actions and the exclusive authority to promulgate rules governing the practice of law. *See* Ohio Const., art. IV, § 2(B)(1)(g); Ohio Const., art. IV, § 5(B); *State ex rel. Parisi v. Dayton Bar Assn. Certified Grievance Commt.*, 2019-Ohio-5157, ¶ 26 ("this court is the ultimate arbiter of attorney discipline" and has "the unique and complete responsibility . . . to regulate all matters related to the practice of law"). In short, this court has the first and last word when it comes to the Code of Judicial Conduct, and no one can stop this court from changing its rules, as it does today. But just because this court has the power to do something does not mean that it should, especially in the manner it does in this case. By

effectively striking a rule from the Code of Judicial Conduct in a disciplinary action—with no public notice and comment or briefing from the parties—this court casts aside its typical rulemaking process.

{¶ 87} The majority's opinion also comes as a surprise because it decides a federal constitutional issue—one that this court has never confronted—without the benefit of briefing and rejects well-reasoned decisions of several United States Courts of Appeals upholding state anti-endorsement restrictions on judges and judicial candidates against First Amendment challenges. *See Platt v. Bd. of Commrs. on Grievances & Discipline of the Ohio Supreme Court*, 894 F.3d 235, 263 (6th Cir. 2018) (Ohio); *Wolfson v. Concannon*, 811 F.3d 1176, 1186 (9th Cir. 2016) (Arizona); *Winter v. Wolnitzek*, 834 F.3d 681, 691-692 (6th Cir. 2016) (Kentucky); *Wersal v. Sexton*, 674 F.3d 1010, 1028 (8th Cir. 2012) (Minnesota).

{¶ 88} Even if this court had before it a First Amendment challenge to Jud.Cond.R. 4.1(A)(3), I would hold that respondent John William Rudduck's First Amendment rights are not a defense to the disciplinary action at issue here. I would adopt the board's findings of fact, conclusions of law, and recommended sanction. Because the court instead dismisses the complaint against Rudduck, I respectfully dissent.

## I. The Anti-Endorsement Rule and the First Amendment

{¶ 89} Relator, disciplinary counsel, charged Rudduck, in part, with a violation of Jud.Cond.R. 4.1(A)(3), which prohibits a judge from publicly endorsing or opposing another person for a public office. Jud.Cond.R. 4.1(A)(3) aligns with Model Rule 4.1(A)(3) of the American Bar Association's Model Code of Judicial Conduct. *See* American Bar Association, *Model Code of Judicial Conduct* (2020), available at https://www.americanbar.org/groups/professional _responsibility/publications/model_code_of_judicial_conduct/model_code_of_ju dicial_conduct_canon_4/ (accessed Feb. 3, 2026). The board found that Rudduck had committed that violation and recommended that he be publicly reprimanded.

And after we, in accordance with Gov.Bar R. V(17)(A), ordered the parties to "show cause why the recommendation of the board should not be confirmed by the court," Rudduck and disciplinary counsel filed a joint waiver of objections consistent with Gov.Bar R. V(17)(B)(3). Nevertheless, the majority has sua sponte raised an argument to strike Jud.Cond.R. 4.1(A)(3) as facially unconstitutional. Sua sponte raising the argument is wrong procedurally, and striking the rule is wrong substantively.

### A. The Parties Jointly Waived Objections

{¶ 90} As noted above, this court is the ultimate arbiter of attorney discipline, and it is not required to adopt the sanction recommended by the board. *Disciplinary Counsel v. Sarver*, 2020-Ohio-5478, ¶ 30; citing *Cincinnati Bar Assn. v. Powers*, 2008-Ohio-4785, ¶ 21. And to ensure consistency in disciplinary sanctions and to protect the public, "'we examine each case individually and impose the discipline we believe appropriate based on the unique circumstances of each case.'" *Toledo Bar Assn. v. Hales*, 2008-Ohio-6201, ¶ 21, quoting *In re Disciplinary Action Against Ruffenach*, 486 N.W.2d 387, 390 (Minn. 1992); *see also Mahoning Cty. Bar Assn. v. Macala*, 2024-Ohio-3158, ¶ 46. But our disciplinary authority is not unlimited.

{¶ 91} This court promulgated Gov.Bar R. V to establish the procedures for evaluating and adjudicating attorney-discipline matters. *See* Gov.Bar R. V(2)(A). And under Gov.Bar R. V(27)(A), attorney-discipline proceedings are subject to the Rules of Civil Procedure. Gov.Bar R. V and the civil rules govern the parties equally, and we will not disregard those rules, even when they limit our review. *See Disciplinary Counsel v. Mancino*, 2018-Ohio-3017, ¶ 13, 18 (Fischer, J., concurring) (because Gov.Bar R. V provides no mechanism for reviewing counts that were unanimously dismissed by a panel of the board, this court was constrained from considering the dismissed allegations); *Ackman v. Mercy Health W. Hosp., L.L.C.*, 2024-Ohio-3159, ¶ 19 (this court will not disregard the Rules of Civil

Procedure).

{¶ 92} Our disciplinary proceedings are adversarial in nature. After the board serves a respondent with a certified complaint in which a relator alleges specific misconduct committed by the respondent, Gov.Bar R. V(10)(E) and V(11), the respondent has an opportunity to file an answer responding to those allegations, Gov.Bar R. V(12)(D). Thereafter, a three-member panel of the board conducts a formal hearing that is governed by the Rules of Civil Procedure and the Rules of Evidence. *See* Gov.Bar R. V(12)(C) and (F) and V(27)(A). The panel then determines whether the matter should be dismissed or whether the respondent is guilty of misconduct and should be sanctioned. Gov.Bar R. V(12)(G) and (I). If the panel finds misconduct, it must submit a report of its findings of fact, conclusions of law, and recommended sanction to the director of the board. Gov.Bar R. V(I). The board then reviews the matter, and if it determines that a sanction is warranted, it must file with this court a certified report of its findings of fact, conclusions of law, and recommended sanction. Gov.Bar R. V(12)(J) and (K). The respondent then has an opportunity to explain "why the report of the [b]oard [should] not be confirmed and a disciplinary order entered." Gov.Bar R. V(17)(A). The respondent may (1) file objections to the board's report, Gov.Bar R. V(17)(B)(1), (2) file a no-objection brief in support of the recommended sanction of the board, Gov.Bar R. V(17)(B)(2)(i), or (3) join with the relator in filing "a joint waiver of objections," Gov.Bar R. V(17)(B)(3). If the parties file a joint waiver, "the case [is] immediately . . . submitted" to this court for consideration. *Id.*

{¶ 93} Although we must independently review the board's report, as in any adversarial proceeding, we are limited to considering the arguments raised and briefed by the parties, *see Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 15; *Disciplinary Counsel v. Gaul*, 2023-Ohio-4751, ¶ 11. The parties are responsible for raising their own arguments in a timely manner and must bear the costs of their own mistakes. *See Jones v. Cleveland*

*Clinic Found.*, 2020-Ohio-3780, ¶ 24. We have warned parties in disciplinary cases that we will not review objections unaccompanied by supporting arguments. *See Gaul* at ¶ 11 ("we reluctantly consider the arguments [raised by the respondent in his posthearing brief filed with the board] that have been incorporated by reference [in his brief filed in this court], though we have no intention to do so in other cases going forward" because S.Ct.Prac.R. 16.02(B)(4) requires the parties' briefs to contain arguments relevant to their positions); *Disciplinary Counsel v. Hoover*, 2024-Ohio-4608, ¶ 19, fn. 2 (following *Gaul*). To hold otherwise is to (1) render unnecessary the three types of responses to our show-cause orders permitted under Gov.Bar R. V(17)(B), (2) disregard the requirements set forth in the Rules of Practice of the Supreme Court, *see* S.Ct.Prac.R. 16.02, and (3) ignore principles of party presentation and judicial restraint, *see Epcon* at ¶ 14-16.

{¶ 94} Nevertheless, while the majority acknowledges that Rudduck has not raised any constitutional argument challenging Jud.Cond.R. 4.1(A)(3), the majority sua sponte raises and adjudicates a First Amendment facial constitutional challenge to Jud.Cond.R. 4.1(A)(3). Majority opinion, ¶ 35-39. The majority overlooks the fact that any constitutional issue was explicitly waived by the parties' filing their joint waiver of objections.

{¶ 95} Generally, when a party fails to timely raise an issue before a court, that issue is deemed forfeited and an untimely argument raising the issue is reviewed only for plain error. *See Ohio Power Co. v. Burns*, 2022-Ohio-4713, ¶ 40. When an issue is forfeited in a case governed by the civil rules, such as an attorney-discipline case, *see* Gov.Bar R. V(27)(A), a plain-error review is "'sharply limited to the *extremely rare case* involving *exceptional* circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself'" (emphasis added in *Goldfuss*), *Ohio Power Co.* at ¶ 40, quoting *Goldfuss v. Davidson*, 1997-Ohio-401, ¶ 28; *Jones* at ¶ 24 (plain-error review is not provided for in the Rules of Civil Procedure).

**{¶ 96}** Waiver, however, is different from forfeiture. *See State v. Rogers*, 2015-Ohio-2459, ¶ 20-21. A waiver is an intentional relinquishment or abandonment of a known right or privilege. *State v. Blackburn*, 2008-Ohio-1823, ¶ 17; *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Constitutional rights can be and often are waived, and such waivers are generally found to be valid when they are made in writing. *See Blackburn* at ¶ 17. There is no path for reviewing a waived issue. *See United States v. Jimenez*, 512 F.3d 1, 7 (1st Cir. 2007) ("Not even plain-error review is available to a party who has waived a claim of error.").

**{¶ 97}** Here, disciplinary counsel alleged in his complaint that Rudduck violated three rules of the Code of Judicial Conduct, including Jud.Cond.R. 4.1(A)(3) (a judge shall not publicly endorse or oppose a candidate for another public office). Rudduck, in his answer, denied those allegations. At the hearing, Rudduck did not challenge the constitutionality of Jud.Cond.R. 4.1(A)(3); rather, he maintained that his actions did not violate that rule. He also did not challenge the constitutionality of Jud.Cond.R. 4.1(A)(3) in his posthearing brief but merely reiterated the arguments that he made at the hearing. But when given a final opportunity to challenge the Jud.Cond.R. 4.1(A)(3) violation by objecting to the board's report, Rudduck chose to waive in writing his right to object. Thus, Rudduck intentionally relinquished any objections related to the board's conclusion that he violated Jud.Cond.R. 4.1(A)(3), including constitutional objections, and we must treat that waiver as we would any other intentional relinquishment of a right. Because this issue was waived, we cannot review it.

**{¶ 98}** To review a waived issue is to turn precedent on its head. Unlike the situations in *Gaul* and *Hoover*, in which the parties at least raised an objection to the board's report by referencing arguments made in posthearing briefs, here, the parties *waived* any objections to the board's report. It is inconsistent to tell parties that we will not review objections that incorporate by reference arguments made in posthearing briefs but then independently raise and review objections that were not

raised by the parties at all. Promoting a more restrictive review by this court in a disciplinary case in which the parties filed objections, *see Gaul*, 2023-Ohio-4751, at ¶ 11, and *Hoover*, 2024-Ohio-4608, at ¶ 19, fn. 2, than in a case in which the parties waived objections makes any objection rule superfluous.

{¶ 99} And contrary to the majority's position, we should exercise judicial restraint and "not decide constitutional questions unless it is absolutely necessary to do so," *Epcon*, 2024-Ohio-4989, at ¶ 17. "Constitutional judgments . . . are justified only out of the necessity of adjudicating rights in particular cases . . . ." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973), citing *Marbury v. Madison*, 5 U.S. 137, 178 (1803). "Indeed, 'Ohio law abounds with precedent to the effect that constitutional issues should not be decided unless absolutely necessary.'" *Epcon* at ¶ 17, quoting *Hall China Co. v. Public Util. Comm.*, 50 Ohio St.2d 206, 210 (1977). We have long held that "[c]onstitutional questions will not be decided until the necessity for a decision *arises on the record before the court*." (Emphasis added.) *State ex rel. Herbert v. Ferguson*, 142 Ohio St. 496 (1944), paragraph two of the syllabus. When a constitutional issue is waived, there is no need to decide it, because the party has intentionally relinquished the right to have the court resolve that issue. We must honor the party's decision, perhaps through gritted teeth, and not pursue the waived issue.

{¶ 100} Our having ultimate authority over attorney discipline does not change this result. We are bound by the rules that we have promulgated, until those rules are challenged by a party in a case or until we decide to revisit them through our rulemaking authority. But the majority suggests that when any justice on this court believes that a rule we promulgated is unconstitutional, even when no party has raised that argument, the court must act swiftly to analyze the rule in order to ensure that it comports with constitutional guarantees. Majority opinion at ¶ 35-39. This, the majority says, is because our "power to regulate the practice of law is not absolute" and our rules "'"must comply with the state and federal constitutions

like any other rules.""" *Id.* at ¶ 38, quoting *Shimko v. Lobe*, 2004-Ohio-4202, ¶ 27, quoting *Christensen v. Bd. of Commrs. on Grievances & Discipline*, 61 Ohio St.3d 534, 537 (1991). The majority, quoting an opinion concurring in judgment only, asserts that sua sponte raising the waived and unbriefed First Amendment issue is appropriate because we "'are obligated in the first instance to ensure that the rule[s] comport[] with constitutional guarantees.'" (Bracketed text in original.) *Id.* at ¶ 39, quoting *In re Application of Jones*, 2018-Ohio-4182, ¶ 34 (DeWine, J., concurring in judgment only).

{¶ 101} Notwithstanding that a separate opinion is not binding authority, the separate opinion in *In re Application of Jones* does not stand for the proposition that this court may, whenever it pleases, sua sponte raise and adjudicate waived constitutional issues in disciplinary proceedings. While the majority in *In re Application of Jones* did not rule on the constitutionality of the professional-conduct rule at issue in that case, relying instead on the plain language of the rule to resolve the case, *In re Application of Jones* at ¶ 11, 14-23, the constitutional challenge had been raised and briefed by the parties, *see id.* at ¶ 11. The separate opinion in *In re Application of Jones* did not concoct its own constitutional argument out of thin air as the majority opinion does today.

{¶ 102} Obviously, the rules that we promulgate must comply with the state and federal constitutions and we have an obligation to ensure that the rules are constitutional. But that does not mean that we may disregard the proper avenues by which the rules may be challenged. We necessarily consider the constitutionality of a rule during our rulemaking process, and before we adopt or revise a disciplinary rule, the public is permitted and encouraged to weigh in on the rule through public comment. And we may analyze a rule when deciding a disciplinary case in which the rule is challenged by the parties. By ignoring the proper avenues of review in this case, the majority renders meaningless our rulemaking process and our briefing requirements.

{¶ 103} Nevertheless, the majority maintains that we can justify this departure from precedent and our rules and procedures and ignore the doctrines of party presentation, waiver, constitutional avoidance, and judicial restraint to decide this waived issue because "this is not an ordinary case," majority opinion at ¶ 36. It is true that there are situations "in which a modest initiating role for a court is appropriate." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020). But it is impossible to say that this court takes on a "modest initiating role" by raising, arguing, and adjudicating an unbriefed, unraised constitutional issue that has never been resolved by this court when the parties waived all objections to the board's report. This case does not fit the bill to permit such unchecked and unwelcome interference. *See State ex rel. GateHouse Media Ohio Holdings II, Inc. v. Columbus Police Dept.*, 2025-Ohio-5243, ¶ 41 (in mandamus case in which the relator bears the burden of establishing a right to the requested relief, the issue of which version of a statute applies is not a necessary determination that should sua sponte be raised by the court). We should not become advocates and raise issues sua sponte for the parties, even in a disciplinary case, especially when the parties actively waived their objections.

{¶ 104} But even assuming for the sake of argument that it is proper for this court to sua sponte raise and address a constitutional issue that was *waived* by the respondent, it should do so only in the extremely rare case involving exceptional circumstances in which the error rises to the level that if left uncorrected would undermine the legitimacy of the entire disciplinary process. *See Ohio Power Co.*, 2022-Ohio-4713, at ¶ 40; *Jones*, 2020-Ohio-3780, at ¶ 24; *Goldfuss*, 1997-Ohio-401, ¶ 28. The majority does not explain how failing to address a First Amendment argument challenging the validity of one judicial-conduct rule—an argument that was concocted solely by justices of this court and that was unbriefed and explicitly waived by the parties—would undermine the very legitimacy of this court's disciplinary process, especially when the recommended sanction in this case is a

public reprimand, which is the least-severe sanction that this court can impose, *see* Gov.Bar R. V(12)(A). Despite what the majority says, this is not an extraordinary case, majority opinion at ¶ 36.

{¶ 105} This is a disciplinary action that can affect Rudduck's license to practice law, and he has a property interest in that license. *See State v. Gideon*, 2020-Ohio-6961, ¶ 12 (state regulation of occupations through a licensing process give rise to protected property interests). Such an interest is protected only against deprivations without due process of law. *See Ohio Academy of Nursing Homes, Inc. v. Barry*, 56 Ohio St.3d 120, 126 (1990). And here, Rudduck received due process of law. Rudduck, who is an attorney and who is also represented by attorneys, fully participated in the disciplinary proceedings and has never raised First Amendment concerns to challenge the alleged judicial-conduct violations. And furthermore, he explicitly waived any objections to the board's report. There is no deprivation of due process here that would warrant extraordinary intervention and advocacy by this court.

{¶ 106} The failure to resolve an unraised and unbriefed First Amendment challenge to one of the judicial-conduct rules charged in a disciplinary case does not undermine the legitimacy of the underlying disciplinary process itself. The mere existence of a novel constitutional issue in a case does not elevate the status of that case to the extremely rare, extraordinary case that overcomes application of the forfeiture doctrine, let alone the waiver doctrine. Indeed, we have refused to consider criminal defendants' unbriefed constitutional arguments when their freedom and even their lives were at stake. *See*, *e.g.*, *State v. Roberts*, 2017-Ohio-2998, ¶ 85 (refusing to consider a criminal defendant's Sixth Amendment claim in a death-penalty case because it was raised for the first time during oral argument). And we have held that a party's having failed to raise a double-jeopardy issue did not undermine the legitimacy of the underlying judicial process such that we were required to review that forfeited issue. *See Risner v. Ohio Dept. of Natural*

*Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 25-27. There is no support for the assertion that the First Amendment issue raised by the majority must be resolved to ensure the legitimacy of the disciplinary process.

{¶ 107} Furthermore, this is not an extraordinary case in which intervention is needed because the unraised error could result in extreme penalties or sanctions that could undermine the legitimacy of this court's disciplinary process. Here, the board recommended that Rudduck be subject to public reprimand, which, again, is the least-severe sanction that this court can impose, *see* Gov.Bar R. V(12)(A). And Rudduck is no longer a judge; he retired in 2024. There is no evidence that Rudduck is licensed in another state, which would trigger reciprocal discipline elsewhere if he were disciplined by this court. While attorney discipline is certainly a serious matter, it is hard to perceive this case as being high stakes when even Rudduck did not feel compelled to challenge the board's report filed in this court— he waived his right to object. For these reasons, this case is not a rare and extraordinary case that could undermine the entire disciplinary process without this court's intervention.

{¶ 108} Indeed, the only case that I could find in which this court sua sponte raised a constitutional issue that was not raised or briefed by the parties was in the expedited election case *State ex rel. Maxcy v. Saferin*, 2018-Ohio-4035. In a four-to-three decision, this court justified addressing a constitutional issue that had not been raised or briefed by the parties by explaining that the parties could be forgiven for failing to brief the issue, because our case law in the prior year had (allegedly) diverted from well-settled law in an expedited elections matter. *Id.* at ¶ 14. The majority in *Maxcy* determined that although briefing by the parties would be helpful, it would be "impractical or impossible . . . given the compressed time frame of an expedited election case." *Id.* The majority explained that it was only "[i]n these circumstances [that the court's] prudential policy against addressing arguments not raised by the parties [was] not a barrier to addressing and remedying

a clear mistake before it [was] repeated again." *Id.* Silence, the alternative, was not appropriate, because that would permit the county boards of elections to follow the (allegedly) erroneous case law when the court could simply "return to [its] near-century of jurisprudence regarding how to address" the issue in that case. *Id.*

{¶ 109} The *Maxcy* court's rationale for addressing an unraised and unbriefed constitutional issue does not apply in this case. Unlike the parties in *Maxcy*, the parties in this case cannot be absolved from failing to raise the constitutional issue raised, analyzed, and adjudicated by the majority. Rudduck should have known of the First Amendment issue and raised it, given that the United States Court of Appeals for the Sixth Circuit grappled with this exact question in *Platt* in 2018, *see Platt*, 894 F.3d at 263, a case issued nearly five years before the alleged misconduct occurred in this case, more than six years before the panel held its disciplinary hearing, and more than six and a half years before the disciplinary proceedings reached this court. But Rudduck decided not to pursue the issue or file any objections to the board's report, as evidenced by the joint waiver of objections.

{¶ 110} And unlike in *Maxcy*, this court cannot justify raising the First Amendment issue sua sponte here—especially without first ordering the parties to brief the issue—because we have never addressed the issue. And the majority's conclusion that Jud.Cond.R. 4.1(A)(3) is facially unconstitutional is at odds with decisions from three federal courts of appeals. *See Platt* at 263 (Sixth Circuit); *Wolfson*, 811 F.3d at 1186 (Ninth Circuit); *Winter*, 834 F.3d at 691-692 (Sixth Circuit); *Wersal*, 674 F.3d at 1028 (Eighth Circuit). Thus, this is not a situation in which we are merely returning to the jurisprudence in effect before a recent departure; the majority advocates for a drastic change in the law—striking a judicial-conduct rule that this court promulgated—based entirely on a constitutional argument that was never raised or briefed but was instead actively waived.

{¶ 111} And also unlike *Maxcy*, this is not an expedited elections case; it is a disciplinary proceeding. We are not on an expedited schedule that would require us to sua sponte raise and decide an important constitutional issue without having the parties weigh in. This case has been pending for over a year, and Rudduck is no longer on the bench and has retired from the practice of law in Ohio. Thus, there is no justification for raising this issue sua sponte or for not seeking guidance from disciplinary counsel, who has a duty to investigate and prosecute allegations of misconduct by judicial officers and attorneys, *see* Gov.Bar R. V(4)(A), and Rudduck, who would bear the burden of establishing that Jud.Cond.R. 4.1(A)(3) is unconstitutional, *see State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 2006-Ohio-5512, ¶ 34 (the party challenging the constitutionality of a statute carries the burden of proof).

{¶ 112} As this court has recognized time and again, "justice is *far better* served" when this court has the benefit of briefing and argument before it makes a final determination. (Emphasis added.) *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, fn. 2 (1983). By sua sponte raising a constitutional challenge and concocting its own argument to strike Jud.Cond.R. 4.1(A)(3) as facially unconstitutional, the majority takes up its sword and carves a path for Rudduck on an unraised, unbriefed, and affirmatively *waived* constitutional issue. In doing so, the majority rejects the principles of party presentation, judicial restraint, and constitutional avoidance. *See Epcon*, 2024-Ohio-4989, at ¶ 15, 17 (courts "should ordinarily decide cases based on issues raised by the parties" and "should not decide constitutional questions unless it is absolutely necessary to do so"). And it forgets that this court has said: "We will not search the record or formulate legal arguments on behalf of the parties, because we do not sit as self-directed boards of legal inquiry and research, but preside essentially as arbiters of legal questions presented and argued by the parties before us." (Cleaned up.) *GateHouse Media*, 2025-Ohio-5243, at ¶ 36.

{¶ 113} I cannot condone the majority's actions in this case. We must show restraint and decide only the issues that are properly before us. If this court wants to remove Jud.Cond.R. 4.1(A)(3) from the Code of Judicial Conduct, then it should initiate proceedings under our rulemaking authority to amend the Code of Judicial Conduct. If this court wants to rule on the constitutionality of Jud.Cond.R. 4.1(A)(3), then it should wait for a case in which the issue has been properly presented. At the most, this court could use this case as a vehicle to encourage future litigants to raise this issue. But this court should not fabricate an opportunity to review the constitutionality of Jud.Cond.R. 4.1(A)(3) in this case. The public and the bar deserve better from this court.

{¶ 114} For these reasons, I would not address the First Amendment issue sua sponte, especially without at least giving the parties involved notice and an opportunity to brief the issue. *See Maxcy*, 2018-Ohio-4035, at ¶ 28 (Fischer, J., dissenting) (recognizing the failure of the majority to order supplemental briefing before deciding a constitutional issue sua sponte). Thus, I would not address the constitutionality of Jud.Cond.R. 4.1(A)(3) and would simply independently review the board's findings of fact and determine whether they meet the elements of the alleged judicial-conduct violations, and if so, determine the appropriate sanction.

*B. The Anti-Endorsement Rule Does Not Violate the First Amendment*

{¶ 115} Even though I would not reach the issue of the constitutionality of Jud.Cond.R. 4.1(A)(3), because the issue was not raised and was affirmatively waived by Rudduck, I am compelled to respond to the majority's flawed constitutional analysis. For purposes of a First Amendment analysis, I will assume that Jud.Cond.R. 4.1(A)(3) is a content-based restriction on the political speech of judges and judicial candidates and that to be constitutional, the restriction must survive strict scrutiny. *See Disciplinary Counsel v. Tamburrino*, 2016-Ohio-8014, ¶ 18 (recognizing that "Jud.Cond.R. 4.3 is a content-based regulation of political speech and therefore must withstand strict scrutiny"); *Republican Party of*

*Minnesota v. White*, 536 U.S. 765, 774 (2002) (applying strict scrutiny to a provision in a state's judicial code of conduct that prohibited a judicial candidate from announcing his or her views on disputed legal or political issues); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (plurality opinion) ("A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest."); *but see Siefert v. Alexander*, 608 F.3d 974, 983 (7th Cir. 2010) (refusing to apply strict scrutiny to a judicial anti-endorsement rule by distinguishing a public endorsement by a judge from an announcement by a judicial candidate of his or her views on disputed legal or political issues, which was the type of speech at issue in *White*). Applying the strict-scrutiny test, Jud.Cond.R. 4.1(A)(3) must be narrowly tailored to serve a compelling state interest. *See White* at 774.

{¶ 116} The Code of Judicial Conduct is premised on the unique governmental role of the judiciary, whose authority "'turns almost exclusively on its credibility and the respect warranted by its rulings.'" *In re Judicial Campaign Complaint Against O'Toole*, 2014-Ohio-4046, ¶ 22, quoting *Carey v. Wolnitzek*, 614 F.3d 189, 194 (6th Cir. 2010). The Preamble to the Code of Judicial Conduct sets forth the State's interest in maintaining "[a]n independent, fair, and impartial judiciary" and provides that "judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system." Jud.Cond.R., Preamble [1]. The State's interests in promoting judicial integrity and public confidence in the judiciary are without a doubt compelling state interests. *See O'Toole* at ¶ 26, quoting *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 848 (1978) ("'There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary.'").

{¶ 117} Canon 4 of the Code of Judicial Conduct provides: "A judge or judicial candidate shall not engage in political or campaign activity that is

inconsistent with the independence, integrity, or impartiality of the judiciary." As a general matter, the rules in Canon 4 "are intended to ensure that judges and judicial candidates campaign in a way that fosters and enhances respect for, and confidence in, the judiciary." *O'Toole* at ¶ 25. Therefore, "Ohio has a compelling interest in ensuring that 'judicial campaigns are run in a manner so as not to damage the actual and perceived integrity of state judges and the bar.'" *Id.* at ¶ 26, quoting *Berger v. Ohio Supreme Court*, 598 F.Supp. 69, 75 (S.D.Ohio 1984).

{¶ 118} In striking Jud.Cond.R. 4.1(A)(3) under a strict-scrutiny analysis, the majority identifies three state interests laid out in Canon 4—promoting judicial impartiality, integrity, and independence—and concludes that Jud.Cond.R. 4.1(A)(3) is not narrowly tailored to advance those interests. With respect to the State's interests in judicial impartiality and independence, the majority reasons that Jud.Cond.R. 4.1(A)(3) is overinclusive because it prohibits a judge from endorsing or opposing candidates who would likely never be litigants before the judge and because less restrictive alternatives exist, including mandatory recusal or disqualification of a judge. Majority opinion at ¶ 56-57 (impartiality) and ¶ 62-64 (independence).

{¶ 119} The majority's strict-scrutiny analysis strays too far from the United States Supreme Court's decision in *White*, 536 U.S. 765. In *White*, the Court held that Minnesota's announce clause in its judicial code of conduct, which prohibited a judicial candidate from announcing his or her views on disputed legal or political issues, violated the First Amendment. *Id.* at 768-770. In reaching its holding, the Court considered whether Minnesota's announce clause was narrowly tailored to serve Minnesota's interest in promoting judicial impartiality—meaning a lack of bias toward a particular party in a proceeding. *Id.* at 775-776. The Court reasoned that the announce clause was "barely tailored" to serve Minnesota's interest in promoting judicial impartiality "inasmuch as it [did] not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*."

46

(Emphasis in original.) *Id.* at 776. Here, Ohio's judicial anti-endorsement rule is aimed at restricting a judge from publicly expressing his or her opinion regarding a particular person, i.e., a candidate, and it does not restrict a judge's ability to speak on issues. *See Wersal*, 674 F.3d at 1026 ("the endorsement clause does not regulate speech with regard to any underlying issues, and thus the candidates are free to state their positions on these issues, in line with *White*"); *compare Disciplinary Counsel v. Grendell*, 2025-Ohio-5239, ¶ 34 (analogizing Jud.Cond.R. 3.2's ban on judges voluntarily testifying before a legislative body to the announce-clause restriction at issue in *White*, because both deal with restricting judicial speech on issues).

{¶ 120} Unlike Minnesota's announce clause that was at issue in *White*, which targeted judicial campaign speech on disputed legal or political issues, Ohio's judicial anti-endorsement rule is aimed not at restricting judges' speech in their own campaigns but at preventing judges from publicly inserting themselves into the campaigns of others. When a judge participates in another person's political campaign, "a judge's impartiality can be put into question, and the public can lose faith in the judiciary's ability to abide by the law and not make decisions along political lines." *Wolfson*, 811 F.3d at 1184. The Sixth Circuit determined in *Winter* that Kentucky's judicial anti-endorsement rule was not overinclusive, because it did not prohibit speech against an opponent and banned only the endorsement of a candidate in a different race. *Winter*, 834 F.3d at 691-692. Therefore, I would hold that Jud.Cond.R. 4.1(A)(3) is not fatally overinclusive.

{¶ 121} The majority also reasons that Jud.Cond.R. 4.1(A)(3) does not offer the least restrictive means to further the State's interest in promoting judicial independence and impartiality, because a judge who endorses another candidate may recuse if that endorsement could cause the judge's independence or impartiality to be questioned later in a case before the judge. Majority opinion at ¶ 57 (impartiality) and ¶ 64 (independence). "But recusal is no answer at all . . . ." *Wolfson* at 1186. In rejecting a First Amendment challenge to Arizona's judicial

anti-endorsement rule, the United States Court of Appeals for the Ninth Circuit reasoned in *Wolfson* that "[a] rule requiring judges to recuse themselves from every case where they endorsed or campaigned for one of the parties could 'disable many jurisdictions' and cripple the judiciary." *Id.*, quoting *Williams-Yulee*, 575 U.S. at 454-455. Similarly, the United States Court of Appeals for the Eighth Circuit in *Wersal* upheld Minnesota's judicial anti-endorsement rule against a First Amendment challenge by determining that the rule was narrowly tailored to serve Minnesota's compelling interests of preserving impartiality and the appearance of impartiality. *Wersal* at 1028. In doing so, the Eighth Circuit rejected the notion that judicial recusals offered a less restrictive alternative to prohibiting judicial endorsements, reasoning that "recusal would be an unworkable remedy because candidates and judges would be free to endorse individuals who would become frequent litigants in future cases, such as county sheriffs and prosecutors." *Id.* at 1027-1028, citing *Siefert*, 608 F.3d at 987.

{¶ 122} Allowing judges and judicial candidates to endorse candidates in other political races, so long as they recuse themselves from any proceeding involving that endorsee or that endorsee's opponent, could have an immobilizing effect on the judicial system in Ohio. For instance, consider the situation in which all the sitting judges on a court of common pleas publicly endorse a candidate for county prosecutor and then that candidate is eventually elected and sworn into office. A rule requiring all judges on that court to recuse themselves on every single case brought by that prosecutor would substantially reduce the workload for those judges and require the inefficient and potentially costly appointment of visiting judges. *See Bauer v. Shepard*, 620 F.3d 704, 713 (7th Cir. 2010) ("the politician-judge will be disqualified so often that he will have the equivalent of a paid vacation, while other judges must work extra to protect litigants' entitlement to expeditious decisions"). And if judges refuse to recuse themselves from cases involving a party whom they have endorsed, then the public will be left with serious

doubts regarding the ability of those judges to remain impartial.

{¶ 123} Frequent judicial recusals would also seriously interfere with Ohio's system of electing judges. In Ohio, the election of judges is a constitutionally mandated process. *See* Ohio Const., art. IV, § 6(A). A judge's recusal often means that a visiting judge (i.e., a retired judge or a judge from another court) is appointed to preside over a matter. Thus, a rule encouraging judicial recusals would undermine the voters' right to elect their judges.

{¶ 124} The majority reasons that frequent judicial recusals will not be more likely to occur in the absence of Jud.Cond.R. 4.1(A)(3), because other provisions in the Code of Judicial Conduct will curtail that result. In support of that assertion, the majority cites Jud.Cond.R. 3.1(A) (prohibiting judges from engaging in extrajudicial activities that would interfere with judicial duties) and Jud.Cond.R. 3.1(B) (prohibiting judges from engaging in activities that would lead to frequent disqualification). Majority opinion at ¶ 60. But as seen in this very disciplinary action, that is not the case. Here, the majority found that Rudduck could not be disciplined for publicly endorsing his son's judicial campaign under either Jud.Cond.R. 1.2 (requiring a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary) or Jud.Cond.R. 1.3 (prohibiting a judge from abusing the prestige of the judicial office to advance the personal or economic interests of the judge or others), because doing so would infringe on Rudduck's First Amendment rights. *Id.* at ¶ 70, 79.

{¶ 125} I do not underestimate the rigorous nature of the strict-scrutiny analysis, as the majority contends, *id.* at ¶ 61. The majority points out that the United States Supreme Court has only once held that a law survived strict scrutiny in the First Amendment context, citing *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 484 (2025). *Id.* As I have pointed out, however, the federal courts of appeals that have considered whether judicial anti-endorsement rules survive strict scrutiny have held that they do. *See Platt*, 894 F.3d at 263 (Sixth Circuit); *Wolfson*,

811 F.3d at 1186 (Ninth Circuit); *Winter*, 834 F.3d at 691-692 (Sixth Circuit); *Wersal*, 674 F.3d at 1028 (Eighth Circuit). I am concerned that the majority's restrictive position here will eventually call into question other rules that have the effect of restricting the speech of lawyers and judges.

{¶ 126} With respect to the State's interest in promoting judicial integrity, the majority reasons that there is "'only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance.'" Majority opinion at ¶ 65, quoting *Fed. Election Comm. v. Cruz*, 596 U.S. 289, 305 (2022). The majority then reasons that Jud.Cond.R. 4.1(A)(3) is not narrowly tailored to prevent corruption or the appearance of corruption, because it does not, by its terms, prohibit only those endorsements that amount to corruption or the appearance of corruption. *Id.* at ¶ 67.

{¶ 127} The majority's reliance on *Cruz* for the State's interest in promoting judicial integrity is puzzling. *Cruz* dealt with federal campaign-finance restrictions on the repayment of a federal-office candidate's personal loans to his campaign from campaign funds raised after an election. *Cruz* at 293. *Cruz* has nothing to do with state limits on judges' speech to promote judicial integrity. To be clear, judicial integrity is "a state interest of the highest order." *White*, 536 U.S. at 793 (Kennedy, J., concurring). "The power and the prerogative of a court to [elaborate principles of law in the course of resolving disputes] rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity." *Id.*

{¶ 128} Endorsements, by their very nature, are often the result of political back-scratching "'exchanged between political actors on a quid pro quo basis.'" *Winter*, 834 F.3d at 691, quoting *Siefert*, 608 F.3d at 984. In other words, handing out a political endorsement is rarely a selfless act. Because endorsements are almost always the result of quid pro quo politics, a judicial anti-endorsement rule is narrowly tailored to a state's "compelling interest in preventing judges from

becoming (or being perceived as becoming) part of partisan political machines." *Id.*

{¶ 129} The majority also fails to identify the scope of the State's interests in prohibiting endorsements by judges and judicial candidates. The comments to the Code of Judicial Conduct help clarify the intended reach of the rules. *See Platt*, 894 F.3d at 249 ("as with every provision of the Code [of Judicial Conduct, Jud.Cond.R.] 4.1(A)(3)'s intended reach is clarified by comments, advisory opinions, and staff letters"). In keeping with the State's interests in promoting judicial integrity, independence, and impartiality, Jud.Cond.R. 4.1(A)(3) is specifically concerned with preventing judges from suggesting to the public that they endorse the political campaign of a family member. Comment [5] to Jud.Cond.R. 4.1 provides that "[a] judge or judicial candidate must not become publicly involved in, or publicly associated with, a family member's political activity or campaign for public office." Comment [5] further explains that "[t]o avoid public misunderstanding, judges and judicial candidates should take, and should urge members of their families to take, reasonable steps to avoid any implication that they endorse any family member's candidacy or other political activity."

{¶ 130} The State's interest in having judges avoid implying to the public that they endorse the candidacy of their relatives, as outlined in Comment [5] to Jud.Cond.R. 4.1, is precisely the issue in Rudduck's case, and the board specifically identified Comment [5] in its decision. Rudduck used a public Facebook account, which identified him as "Judge at Clinton County Common Pleas Court" to share multiple posts regarding his son's campaign for a seat on the Clinton County Municipal Court.

{¶ 131} I would hold that the judicial anti-endorsement rule in Jud.Cond.R. 4.1(A)(3) does not violate the First Amendment, because it is narrowly tailored to serve the State's compelling interests in promoting the integrity, independence, and

impartiality of its judiciary. I would also hold that enforcement of Jud.Cond.R. 4.1(A)(3) in this disciplinary action does not violate Rudduck's First Amendment rights. I would uphold the board's determination that Rudduck's use of his Facebook page to post and share information about his son's judicial campaign amounted to Rudduck's publicly endorsing his son, in violation of Jud.Cond.R. 4.l(A)(3). I would therefore also adopt the board's determination that Rudduck's public endorsement of his son violated Jud.Cond.R. 1.2, which requires a judge to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary."

## II. Jud.Cond.R. 1.3 and Rudduck's Facebook "Essay"

{¶ 132} The board also determined that Rudduck's conduct violated Jud.Cond.R. 1.3, which provides: "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so." The basis for the board's determination that Rudduck's conduct violated Jud.Cond.R. 1.3 was a lengthy four-part essay that Rudduck posted to his Facebook page, mainly defending his son against varying personal attacks after Facebook froze his son's account in the days just prior to the election.

{¶ 133} In declining to adopt the board's findings and conclusions, the majority applies Jud.Cond.R. 2.10(E), which allows a judge to "respond directly or through a third-party to allegations in the media or elsewhere concerning the judge's conduct in a matter." *See* majority opinion at ¶ 73. But only one part of Rudduck's four-part essay addressed allegations related to Rudduck's own judicial conduct in a matter. The bulk of Rudduck's essay, as Rudduck conceded, was spent defending his son.

{¶ 134} Rudduck testified that the "genesis" for his essay was his desire to defend his son from defamatory statements. While I can certainly understand Rudduck's frustration as a parent and his perceived need to defend his son in light of the social-media attacks against him, Rudduck's essay contained highly personal

52

information about his son, including his son's medical history and his son's having been drunk while mourning the death of another judge, and addressed unfounded allegations that his son had abused his children. Rudduck posted his essay on a public Facebook account that identified him as a judge. Rudduck admitted that (1) the essay he posted just days prior to the election in which his son was running contained information that could influence a voter, (2) he posted the essay at a time when his son's Facebook account was restricted, and (3) by using his own Facebook account to refute the attacks against his son, Rudduck could get the message out quickly.

{¶ 135} I agree with the board's finding that Rudduck's four-part essay was intended to defend his son's character for purposes of his son's election. I also agree with the board's finding that Rudduck abused the prestige of his judicial office to advance his son's personal interests. Therefore, I would adopt the board's conclusion that Rudduck's conduct violated Jud.Cond.R. 1.3.

### III. The Majority's Word of Caution Is All Bark and No Bite

{¶ 136} Finally, the majority follows its analysis with a "word of caution," noting that although it will not discipline Rudduck for his conduct, it does not "approve of his conduct." Majority opinion at ¶ 81. The majority's disapproving of a judge's conduct while at the same time refusing to discipline that judge is essentially abdicating this court's role in disciplinary matters. The majority warns all judges that they "should forgo making some public statements even if those statements would constitute protected free speech." *Id.* Without the prospect of potential discipline, however, the majority's warning to judges is nothing more than a hollow threat. "[J]udges are held to the highest possible standard of ethical conduct." *Ohio State Bar Assn. v. McCafferty*, 2014-Ohio-3075, ¶ 16. That is precisely why we have the Code of Judicial Conduct. Chipping away at our judicial-conduct rules will inevitably mean lowering our ethical standards. As attorneys and judges, we agree to be bound by ethical rules in exchange for the

privilege to practice law.

## IV. Conclusion

{¶ 137} The majority goes too far in striking the judicial anti-endorsement rule set forth in Jud.Cond.R. 4.1(A)(3) as a violation of the First Amendment. Rudduck waived all objections to the board's report and has never raised a First Amendment challenge to Jud.Cond.R. 4.1(A)(3). At the very least, the parties deserve to have the opportunity to brief this First Amendment issue. And furthermore, the majority could have easily resolved Rudduck's disciplinary action on a narrower, as-applied basis. If a majority of the members of this court believe that the judicial anti-endorsement rule should be set aside or modified, then they should follow the court's process for amending the Code of Judicial Conduct. Doing so would not only avoid abdicating our role as arbiter and taking on the role of advocate by raising constitutional issues on behalf of the parties (and ignoring principles of party presentation, judicial restraint, and constitutional avoidance in the process) but would allow for public notice of the proposed amendment and a public-comment period during which any member of the public could weigh in on the proposed amendments. Seeking public feedback is an important part of this court's rulemaking process.

{¶ 138} In sum, I would adopt the board's findings of fact and conclusions of law with respect to Rudduck's conduct, and I would adopt the board's recommended sanction. Because the court does otherwise, I respectfully dissent.

————————————

Joseph M. Caligiuri, Disciplinary Counsel, for relator.

Montgomery Jonson, L.L.P., George D. Jonson, and Lisa M. Zaring, for respondent.

————————————